R. B. POTASHNICK, an Individual, and Continental Casualty Company, Plaintiff-Third Party Plaintiff, Appellees-Appellants,

v.

PORT CITY CONSTRUCTION COMPANY and United States Fidelity & Guaranty Co., Defendants-Appellants,

v.

The CITY OF MOBILE, ALABAMA, Third-Party Defendant-Appellant, Appellee,

v.

J. B. CONVERSE & COMPANY, INC., Third Party Defendant-Appellee.

UNITED STATES FIDELITY & GUARANTY COMPANY, Plaintiff-Appellant,

Port City Construction Company, Inc., et al., Defendants-Appellants,

v.

W. D. BRUNSON, d/b/a W. D. Brunson Construction Company, Defendant-Appellee.

Nos. 76–2373, 78–2386.

United States Court of Appeals, Fifth Circuit.

Jan. 15, 1980.

Rehearing and Rehearing En Banc Denied Feb. 14, 1980.

---

Joseph J. Boswell, Mobile, Ala., for Port City Const. Co.

John D. Richardson, Mobile, Ala., for Fidelity & Guaranty Co., Inc.

William H. Brigham, Mobile, Ala., for City of Mobile.

G. Hamp Uzzelle, III, Paul W. Brock, Mobile, Ala., for R. B. Potashnick and Cont. Casualty Co.

James H. Lackey, Mobile, Ala., for W. D. Brunson.

W. Boyd Reeves, Broox G. Holmes, Mobile, Ala., for J. B. Converse & Co.

Before COLEMAN, Chief Judge, RONEY and FAY, Circuit Judges.

FAY, Circuit Judge:

The case began amid a flurry of claims, counterclaims, and cross-claims. The thirty-three day trial of the action spawned a record of twenty-five volumes as well as the eleven briefs submitted on appeal. Out of this morass emerge questions involving the right to the effective assistance of hired counsel in a civil case, and the disqualification of a trial court judge from participation in the proceeding before him. Our resolution of the issues requires us to reverse this case on two separate grounds.

Our first ground for reversal results from the trial court judge's failure to disqualify himself from participation in the proceeding before him. The judge in this case was involved in business dealings with the plaintiff's attorney. The judge's father was senior partner in the law firm representing the plaintiff. The parties do not allege that the judge exhibited any actual bias or prejudice in the case; they assert only that under the circumstances his impartiality might reasonably be questioned.

A recently amended federal statute sets forth the applicable requirements for judicial disqualification. Relying on the legislative history and policy underlying the statute, we hold that the judge in this case was required to disqualify himself on grounds that either were not or could not be waived by consent of the parties. We therefore reverse the judgments in the main action of this lawsuit and order a new trial before a different judge. We affirm the judgment entered in the case consolidated with the main action for trial, since the disqualification of the judge arose out of circumstances unrelated to the consolidated lawsuit.

The second ground for reversal stems from the application of the trial court judge's rule prohibiting each witness from conferring with his or her attorney during breaks and recesses in the witness' testimony. One of the attorneys in the case violated this rule by talking to his client, a party to the action, during an overnight recess in the party-witness' testimony. The judge granted opposing counsel's motion to exclude further testimony by the party-witness, but the party-witness then agreed to waive trial by jury in lieu of excluding his testimony.

Our analysis of the fifth amendment to the United States Constitution establishes that a civil litigant has a constitutional right to retain hired counsel. Because the prohibiting of communication between a testifying party-witness and his attorney during an overnight recess in the party-witness' testimony impinges on that constitutional right, we are compelled to reverse. This second ground for reversal applies only to the main action of the lawsuit since the party raising this issue does not contest the judgment in the case consolidated with the main action for trial. We again affirm the judgment in the consolidated action.

I. The Facts and Proceedings

A. The Underlying Lawsuit

This convoluted multi-party diversity action arose out of the construction of an aerated lagoon for the City of Mobile, Alabama (City). On October 5, 1973, R. B. Potashnick (Potashnick), the general contractor for the lagoon project, filed a complaint against Port City Construction Company (Port City), a subcontractor hired to

perform dirt work, and United States Fidelity and Guaranty Company (U.S.F. & G.), Port City's bonding company. Port City had left the project and plaintiff Potashnick sought recovery for the cost overrun he incurred in completing Port City's work. The complaint also asked for damages resulting from delay of the project caused by Port City's alleged unsatisfactory performance, and included a claim for recovery over of liquidated damages claimed against Potashnick by the City of Mobile, the owner of the project.

Port City and U.S.F. & G. answered the complaint, and Port City filed a counterclaim seeking damages against Potashnick and his bonding company, Continental Casualty Company (Continental). Port City's counterclaim asserted breach of implied warranty, misrepresentation, breach of contract by failure to pay on time, extra work over and above contractual obligations, anticipatory breach of contract, and extra work plus a modification of the contract. Potashnick and Continental answered Port City's counterclaim, denied liability, and filed a third-party complaint against the City and J. B. Converse and Co., Inc. (Converse), the engineering firm which designed the lagoon project and supervised its construction. The third-party complaint sought recovery against Converse and the City for breach of implied warranty, negligence in design, negligence in supervision, and misrepresentation. In addition, recovery was sought against the City alone for work over and above contractual obligations. Potashnick made a separate claim for recovery of the withheld retainage and payment due on the contract plus interest. Potashnick and Continental prefaced each of their jointly asserted claims against the City and Converse with the caveat that they strongly denied all claims by Port City and that the third-party complaints were asserted only on the alternative possibility that the court might find in favor of Port City on its claim against Potashnick and Continental.

The City answered the third-party complaint of Potashnick and Continental and filed a counterclaim against them seeking to recover liquidated damages as well as indemnity from Potashnick for any. damages that might be awarded in favor of Potashnick and Continental against the City. The City also filed a cross-claim against Converse, the engineer, seeking indemnity from it on theories of negligence, breach of warranty, and misrepresentation. In its cross-claim the City emphatically denied that Converse had been guilty of negligence, breach of warranty, or misrepresentation but asserted its claim for indemnity solely on the basis that it was entitled to indemnity should the court find any merit to Port City's allegations.

The above claims were all asserted in the case of *Potashnick v. Port City Construction Co.* Consolidated with this case for trial was the case of *United States Fidelity and Guaranty Co. v. Port City Construction Co.* This second case was initially filed as an action by U.S.F. & G. seeking exoneration from liability on the labor and material bonds which it had entered into as surety for Port City on its contracts with Potashnick. Prior to trial, judgments were entered on all but one of the many labor and material claims asserted in that litigation. In addition, U.S.F. & G. obtained a judgment for indemnity on the master surety agreement against Port City and the indemnitors on that agreement. The remaining claim in the exoneration action was that of W. D. Brunson (Brunson), a supplier and subcontractor of Port City seeking to recover payment for the work he performed on the job. Brunson's counterclaim against U.S.F. & G. and his cross-claim against Port City were transferred to the *Potashnick* action for further proceedings.

B. The Proceedings in the District Courts

Most of the issues raised in this appeal arise out of the actual proceeding which commenced on August 4, 1975 as a jury trial. Prior to the taking of any testimony, District Court Judge William Brevard Hand instructed all witnesses, parties, and counsel that witnesses were not to discuss their testimony with anyone except counsel, and

then only individually and out of the presence of other witnesses. The judge further instructed that no direct reference was to be made to one witness of the prior testimony of another witness. The stated purpose of these instructions was to avoid the programming of witnesses to rebut other witnesses' testimony. Record, vol. 12, at 47–49. Subsequently, during a break in the testimony of the first witness, the judge instructed that during recesses and breaks in a witness's testimony it would be highly improper for counsel to have any conversations with that witness until his testimony was complete. No objections were raised to this instruction. Record, vol. 13, at 652–53.

Several weeks into the trial, on September 23, 1975, the court was informed that counsel for Port City had violated the court's instructions by conversing with a testifying client-witness during a break in that witness's testimony. An in-chambers conference between the court and counsel revealed that counsel for some of the parties had not understood the judge's rule to prohibit an attorney from speaking with his own client in the process of testifying. Counsel for Port City disclosed that he had also violated the court's instructions by discussing a prior witness' testimony with two witnesses who had not yet testified. Record, vol. 21, at 4518–40. In response to a motion by counsel for Potashnick, Judge Hand indicated that the witnesses involved in each of Port City's rule violations would be disqualified from giving any further testimony in the case. The judge then said that he would be willing to grant Port City a mistrial if it so requested. One of the parties suggested as an alternative that the case be allowed to proceed without a jury in lieu of disqualifying Port City's witnesses. Port City's attorney, stating that his client's case would be greatly harmed by the disqualification of the witnesses and that his client could not afford a mistrial, moved to proceed without a jury. Record, vol. 21, at 4575. Judge Hand, along with several of the parties, refused to acquiesce in proceeding without a jury until Port City waived its right to jury trial and agreed not to object on appeal to the case being heard non-jury. *Id.* at 4580–85.

The case proceeded without a jury and concluded after thirty-three days of trial. In March, 1976 judgment was entered in favor of Potashnick and against Port City and U.S.F & G.; in favor of Potashnick and against the City; in favor of Brunson against Port City and U.S.F. & G.; and in favor of U.S.F. & G. against Port City and the indemnitors on the master surety agreement. Judgment was also entered in favor of Converse dismissing the claims against it of Potashnick, Continental, and the City; in favor of Continental, dismissing the claims against it of Port City and the City; and in favor of the City, dismissing the claim against it of Continental. Findings of fact and conclusions of law supporting the judgments were entered. Record, vol. 4, at 676–753. Subsequently, Port City, U.S.F. & G., the indemnitors, and the City filed notices of appeal; a limited notice of appeal was filed by Potashnick and Continental.

### C. The Hearing on Remand: Was the Judge Disqualified?

Upon motion of Port City and the indemnitors, our court remanded the case for the limited purpose of determining whether District Court Judge William Brevard Hand was disqualified to hear the case. In their Motion to Vacate Judgment and Order New Trial, Port City and the indemnitors argued that Judge Hand should have disqualified himself from trying the case because (1) the judge was so connected with Potashnick's law firm—Hand, Arendall, Bedsole, Greaves & Johnston (Hand, Arendall)—and with Potashnick's chief trial counsel, Paul Brock, that his impartiality might reasonably be questioned; (2) the judge was being personally represented in other matters by Hand, Arendall and by Brock; and (3) the judge's father was a partner in Hand, Arendall. The movants did not claim that Judge Hand was biased in favor of or against any party; they questioned only the appearance of impartiality.

The motion to disqualify was heard by District Court Judge William Stafford of the Northern District of Florida. Based on the affidavits, exhibits, and argument,

Judge Stafford found that prior to his appointment to the federal bench, in 1971, Judge Hand had practiced law in Mobile, Alabama. Judge Hand and Paul Brock had been partners in Hand, Arendall and they enjoyed an ongoing friendly relationship. During the time they were law partners Judge Hand and Brock would occasionally invest with clients and one or more other members of the firm in real estate to be held for future development. Most of these purchases occurred several years ago, prior to Judge Hand's appointment to the bench. The improved properties have always been managed by professional managers or developers with no active management by Judge Hand or Brock. During the period of time the *Potashnick* case was before Judge Hand, he and Brock did not make any joint investments, but several transactions took place involving property in which Judge Hand had a small interest. These transactions included the assignment of a mortgage and rents from an apartment building, and several conveyances of property interests. Additionally, in 1973 two lawsuits were filed in the circuit court of Mobile County relating to some property in which Judge Hand and Brock had an interest. The first of these suits, *Blackman v. Lurlyne Land Co.*, involved property in which Judge Hand had previously held an interest. While the judge was not a named defendant and had no connection with the corporate defendants in the action, the release Brock prepared to settle the case included Judge Hand. The second lawsuit, entitled *Hufstutler v. Lurlyne Land Co.*, originally did not name Judge Hand as a defendant, but the complaint was subsequently amended to include Judge Hand, Brock, and others as defendants. On the day final judgment was entered in *Potashnick*, Brock wrote a letter to all the named defendants in *Hufstutler* informing them of the amended complaint and suggesting that they contact their insurance carriers. In that same letter Brock offered to make an appearance on behalf of the defendants to prevent default until they could determine their insurance coverage. On April 21, 1976 Brock filed such an appearance on behalf of all defendants; at that time Judge Hand had already denied the motion for new trial in *Potashnick*. Amended Opinion and Order on Limited Remand, Record, vol. 7, at 1579–84.

As to the relationship of Judge Hand's father to the Hand, Arendall firm, Judge Stafford found that Charles C. Hand was the senior partner of Hand, Arendall. At the time Judge Hand was appointed to the federal bench, his father was eighty years old and had limited participation in the affairs of the firm. During the time *Potashnick* was pending Mr. Hand received one percent of the firm's income, but at some point prior to the entry of judgment in the case his income was changed to a fixed amount unrelated to the income of the firm. Judge Stafford's opinion also notes that Hand, Arendall's fee for its participation in *Potashnick* was at a fixed hourly rate from the inception. Accrued fees were billed monthly and paid promptly. *Id.* at 1586.

Judge Stafford ruled that the applicable statutory provision relating to judicial disqualification was the amended version of 28 U.S.C. § 455.[1] Applying the relevant sections of the statute, Judge Stafford found no reasonable basis for disqualification of Judge Hand. Notices of appeal from Judge Stafford's opinion and order were filed by Port City and the indemnitors, and a limited notice of appeal was filed by R. B. Potashnick and Continental. The appeals from Judge Stafford's opinion and order have been consolidated with the appeals from Judge Hand's decision on the merits of the underlying lawsuit. We reverse in part and affirm in part on each of the consolidated appeals.

## II. The Disqualification Issue

### A. The Applicable Statute

At the time this lawsuit was instituted, the federal statute relating to judicial disqualification provided:

---

1. 28 U.S.C. § 455 (1970) was amended by Act of Dec. 5, 1974, Pub.L.No.93–512, § 2, 88 Stat. 1609.

Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.

28 U.S.C. § 455 (1970). While the case was pending, but prior to the commencement of trial, 28 U.S.C. § 455 was amended to bring the statutory grounds for disqualification of judges into conformity with the recently adopted canon of the Code of Judicial Conduct [2] relating to disqualification of judges for bias, prejudice, or conflict of interest. See H.R.Rep.No.93–1453, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News, pp. 6351, 6352–54 [hereinafter cited as 1974 U.S.Code Cong. & Admin.News]. The amended version of 28 U.S.C. § 455 reads as follows:

**§ 455. Disqualification of justice, judge, magistrate, or referee in bankruptcy**

(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as di-

2. Canon 3C of the Code of Judicial Conduct was adopted by the Judicial Conference of the United States in April, 1973.

rector, adviser, or other active participant in the affairs of a party, except that:

(i) Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(e) No justice, judge, magistrate, or referee in bankruptcy shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

28 U.S.C. § 455 (1976). Congress provided that section 455 as amended "shall not apply to the trial of any proceeding commenced prior to the date of this Act [Dec. 5, 1974], nor to appellate review of any proceeding which was fully submitted to the reviewing court prior to the date of this Act." Act of Dec. 5, 1974, Pub.L.No.93–512, § 3, 88 Stat. 1609. One of the issues raised on appeal is whether Judge Stafford erred in applying amended 28 U.S.C. § 455 to the *Potashnick* action, which had been filed prior to the effective date of the statute.[3]

In his opinion Judge Stafford noted the lack of uniformity among the reported decisions addressing the applicability of the 1974 amendment of section 455. *See, e. g., National Auto Brokers Corp. v. General Motors Corp.,* 572 F.2d 953, 958 n.9 (2d Cir. 1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979); *United States v. Haldeman,* 181 U.S.App.D.C. 254, 353 n.284, 559 F.2d 31, 130 n.284 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *In re Continental Vending Machine Corp.,* 543 F.2d 986, 995 n.4 (2d Cir. 1976); *Bradley v. Milliken,* 426 F.Supp. 929, 932 (E.D.Mich.1977); *Samuel v. University of Pittsburgh,* 395 F.Supp. 1275, 1277 (W.D.Pa.1975), *vacated on other grounds,* 538 F.2d 991 (3d Cir. 1976). Neither the language of the statute nor the cases discussing it clearly indicate whether the amendments were intended to apply to actions filed but not actually brought to trial prior to December 5, 1974, or only to cases instituted after that date. This inquiry is further confused by the fact that the statute does not apply to the "trial of any proceeding" commenced prior to the effective date, while the statutory definition of "proceeding" includes "pretrial, trial, appellate review, or other stages of litigation." 28 U.S.C. § 455(d)(1) (1976).

█ Notwithstanding substantial authority to the contrary, we are compelled to hold that the amended version of 28 U.S.C. § 455 is applicable to a case filed prior to the December 5, 1974 effective date of the amendment, when the trial of the case does not commence until after the effective date. This holding is mandated by our decisions in *Davis v. Board of School Commissioners,* 517 F.2d 1044 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976) and *Parrish v. Board of Commissioners,* 524 F.2d 98 (5th Cir. 1975) (*en banc*), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). *See Fredonia Broadcasting Corp. v. RCA Corp.,* 569 F.2d 251 (5th Cir. 1978), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). In *Davis,*

---

**3.** The effective date of amended 28 U.S.C. § 455 is December 5, 1974. The initial pleading in this case was filed October 5, 1973. Trial of the action commenced August 4, 1975.

amended section 455 was applied to an action which was filed but not tried prior to the December 5, 1974 effective date of the amendment. In *Davis* we did not discuss or cite section 3 of the Act (the effective date section) but merely stated that "[t]he recent amendment of 28 U.S.C.A. § 455 . . . also must be considered." 517 F.2d at 1051.[4] In *Parrish*, as in *Davis*, the court was reviewing the question of disqualification of a trial court judge. The court held that it would apply the standards of amended section 455 in its appellate review if the appeal was not fully submitted prior to December 5, 1974, regardless of when the case was filed or trial commenced in the trial court. 524 F.2d at 102.[5] Bound by these precedents, we review the disqualification issue before us under the amended standards of 28 U.S.C. § 455.[6]

### B. The Grounds for Disqualification

### 1. The Brock-Hand Connection

■ The various relationships between Judge Hand, Paul Brock, and the Hand, Arendall firm give rise to several potential grounds for disqualification of the judge under 28 U.S.C. § 455.[7] Port City first claims that during the pendency of the case

Judge Hand was so closely connected with Paul Brock, attorney for Potashnick, that his impartiality might reasonably be questioned. This argument for disqualification under 28 U.S.C. § 455(a) is based on affidavits and exhibits which detail the business dealings of Judge Hand and Paul Brock. Port City also alleges that while the instant action was pending Brock represented Judge Hand in several unrelated matters. The district court found no reasonable basis for disqualification on these grounds, Judge Stafford noting that "it is indeed difficult to imagine that Judge Hand would be impartial [sic] because of any interest he shares with Brock or others in investments unconnected with this litigation." Amended Opinion and Order on Limited Remand, Record, vol. 7, at 1585. We disagree with this conclusion of the district court. Based on our interpretation of the language, history, and underlying policy of 28 U.S.C. § 455, the relationship between the judge and Paul Brock presented a situation in which the judge's impartiality might well be questioned.

Section 455(a) provides that a judge shall disqualify himself in any proceeding in which "his impartiality might reasonably be

---

4. The subsequent *Parrish* decision suggests that the court was confused about its application of section 455 in *Davis*. The *Parrish* opinion states that "[w]e held in *Davis v. Board of School Commissioners of Mobile County, supra*, that the amended statute applied where that appeal had not been fully submitted on the effective date of the Act." 524 F.2d at 102. In fact, the significant date in *Davis* under section 3 of the Act was the date trial commenced (and not the date of submission of the appeal) since the standards for disqualification were being applied to a trial court judge.

5. Judge Roney, in his special concurrence in *Parrish*, highlights the confusion surrounding the application of amended section 455.

> I agree that *en banc* consideration makes this an appellate review not "fully submitted," so that § 455, as amended, would apply *to* this appellate review, which means it would set the standard for recusal of any of our reviewing judges who might be challenged for bias. But that is not the question. The district judge sat at trial. What act applied *to* the trial? Congress clearly provided that the new § 455 Act "shall not apply to the trial of any proceeding" commenced prior

to December 5, 1974. The trial of this proceeding was completed prior to that date. We are judging the correctness of that trial and should do so by the standard applying to it as clearly set forth in the statute.
> 524 F.2d at 105.

6. The legislative history of amended 28 U.S.C. § 455 does provide some support for applying the statute in this case. The sectional analysis set forth in the House Report states that "Section 2 [sic] makes the bill inapplicable to trials commenced and to appellate matters which were fully submitted prior to the effective date of the Act." 1974 U.S.Code Cong. & Admin. News, pp. 6351, 6362. The negative implication of this sectional analysis is that the statute applies to trials commenced subsequent to the effective date, regardless of when the proceeding was instituted. Under this interpretation amended 28 U.S.C. § 455 would clearly apply to the instant case, the trial of which commenced in August, 1975.

7. All subsequent references to 28 U.S.C. § 455 are to the amended version of the statute.

questioned." This language sets up an objective standard, rather than the subjective standard set forth in the prior statute through use of the phrase "in his opinion." According to the report of the House Judiciary Committee, the general standard of section 455(a) was designed to promote the public's confidence in the impartiality and integrity of the judicial process by saying, in effect, that if any reasonable factual basis for doubting the judge's impartiality exists, the judge "shall" disqualify himself and let another judge preside. 1974 U.S. Code Cong. & Admin.News, pp. 6351, 6354–55.

■ Clearly, the goal of the judicial disqualification statute is to foster the *appearance* of impartiality. *Cf.* E. Thode, *Reporter's Notes to Code of Judicial Conduct* 60–61 (1973). This overriding concern with appearances, which also pervades the Code of Judicial Conduct and the ABA Code of Professional Responsibility, stems from the recognized need for an unimpeachable judicial system in which the public has unwavering confidence. As this court has noted, "the protection of the integrity and dignity of the judicial process from any hint or appearance of bias is the palladium of our judicial system." *United States v. Columbia Broadcasting System, Inc.*, 497 F.2d 107, 109 (5th Cir. 1974).[8] Any question of a judge's impartiality threatens the purity of the judicial process and its institutions.

■ Because 28 U.S.C. § 455(a) focuses on the appearance of impartiality, as opposed to the existence in fact of any bias or prejudice, a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street. Use of the word "might" in the statute was intended to indicate that disqualification should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality. Note, *Disqualification of Judges and*

*Justices in the Federal Courts*, 86 Harv.L. Rev. 736, 745 (1973). We believe that a reasonable person with knowledge of the business investments of Judge Hand and Paul Brock and the legal representation of the judge by Brock might very well question the judge's impartiality in a trial involving Paul Brock as chief counsel for a litigant.

The Brock-Hand relationship presents a situation rarely dealt with by courts involved in disqualification issues. A similar problem did arise in *Smith v. Sikorsky Aircraft*, 420 F.Supp. 661 (C.D.Cal.1976). The judge in that case was disqualified despite the absence of any personal bias or prejudice because the plaintiff's law firm was associated with an attorney who had in the past acted as attorney and counsel for the judge. The relationship at issue in *Potashnick* raises more questions than that in *Smith*; here the judge was not only being represented, albeit nominally, by Brock during the *Potashnick* litigation, but he had business dealings with him as well.

Counsel for Potashnick urges that Judge Stafford's opinion should not be interpreted as finding an attorney-client relationship between Judge Hand and Paul Brock at any material time. Whether a formal attorney-client relationship existed is not integral to our decision. The release prepared by Brock in the *Blackman* matter, which included Judge Hand, the offer of representation by Brock on the very day judgment was entered in *Potashnick*, along with the business relationship, are sufficient to raise a reasonable question of impartiality.

■ In deciding that Judge Hand should have disqualified himself under 28 U.S.C. § 455(a) on the grounds discussed above, we note that "[t]he issue of disqualification is a sensitive question of assessing all the facts and circumstances in order to determine whether the failure to disqualify was an abuse of sound judicial discretion." 1974 U.S.Code Cong. & Admin.News, pp. 6351,

---

**8.** Judge Hand shares our concern with appearances. Instructing the jury in *Potashnick* to avoid conversations with people in and around the court building, he noted that "[a]n appear-

ance of evil is often worse than the evil itself, and others get the notion that we do not administer justice in our court system." Record, vol. 13, at 626–27.

6355. The amendment of 28 U.S.C. § 455 did not alter the standard of appellate review on disqualification issues; however, the new statute requires a judge to exercise his discretion in favor of disqualification if he has any question about the propriety of his sitting in a particular case. Under the prior version of section 455, a judge faced with a close question on disqualification was urged to resolve the issue in favor of a "duty to sit." *See Edwards v. United States,* 334 F.2d 360, 362 n. 2 (5th Cir. 1964), *cert. denied,* 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965). The language of the new statute eliminates the so-called "duty to sit." The use of *"might* reasonably be questioned" in section 455(a) (emphasis added) clearly mandates that it would be preferable for a judge to err on the side of caution and disqualify himself in a questionable case. In reviewing the exercise of judicial discretion in this case, we cannot ignore that the disqualification of a judge in any given case does not cause the delay or inconvenience which resulted in prior times. The growing number of federal judges, and the availability of rapid transportation to move those judges from place to place when necessary, make the decision to disqualify much less burdensome on the judicial system than in times past; any inconvenience which does arise is more than outweighed by the need to protect the dignity and integrity of the judicial process. Our desire to maintain an untarnished judiciary compels us to hold that Judge Hand was required by 28 U.S.C. § 455(a) to disqualify himself from the *Potashnick* case, and his failure to do so constituted an abuse of sound judicial discretion.

Although the mandate of section 455 compels us to disqualify Judge Hand in this case, we respect his willingness to participate in a proceeding from which any other judge would have recused himself with relief, if not delight. The record reveals the personal hardship imposed on the judge by the length and complexity of the case and the number of parties and witnesses involved. Judge Hand nevertheless tried the case fairly and efficiently, and, to his credit, none of the parties allege any bias or prejudice in his handling of the matter. The parties consistently refused the judge's repeated offers to disqualify himself, evidencing their confidence in his ability to dispense justice evenhandedly.

Judge Hand's failure to disqualify himself in this case resulted from his natural reluctance to impose a trial such as *Potashnick* on one of his brethren. We note that there are only two judges on the bench in the Southern District of Alabama; if one of the two recuses himself from a case, the burden falls on the docket of his colleague. Judge Hand's determination to carry his share of the caseload is to be admired notwithstanding its unfortunate result in this case.

2. The Judge's Father

Port City claims that Judge Hand was disqualified to act in the *Potashnick* case because his father, Charles C. Hand, is Paul Brock's law partner. This assertion is based upon sections 455(b)(5)(ii) and (iii), which provide that a judge should disqualify himself when

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

. . . . .

(ii) Is acting as a lawyer in the proceeding;
(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding.

 The district court reviewing the motion to disqualify determined that the judge's father was not acting as a lawyer in the case because he did not actually participate in it. The court then considered the partnership arrangement between Charles Hand and Hand, Arendall as well as the fee arrangements between Potashnick and Hand, Arendall, and concluded that Charles Hand did not have an interest known to Judge Hand which could have been substantially affected by the outcome of the case. We agree that Charles C. Hand was not "acting as a lawyer" in the *Potashnick*

case so as to disqualify the judge under section 455(b)(5)(ii). That provision requires actual participation. *United States ex rel. ·Weinberger v. Equifax, Inc.,* 557 F.2d 456, 463 (5th Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *see SCA Services, Inc. v. Morgan,* 557 F.2d 110 (7th Cir. 1977); Code of Judicial Conduct, Commentary to Canon 3C(1)(d)(ii). We disagree, however, with the lower court's conclusion under section 455(b)(5)(iii). We hold that when a partner in a law firm is related to a judge within the third degree, that partner will always be "known by the judge to have an interest that could be substantially affected by the outcome" of a proceeding involving the partner's law firm.

*United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456 (5th Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978) supports this decision. In that case, the district court judge's son was an associate of the law firm representing Equifax. The judge's son did not actively participate in Equifax's defense so as to be acting as a lawyer under section 455(b)(5)(ii). In deciding against disqualification of the judge, the court noted that "[t]he 'financial interest' provision [section 455(b)(5)(iii)] might apply if the district judge's son were a partner in the firm. But his status as an associate removes that fear. . . . His salary interest as an associate is too remote to fall under this 'financial interest' prohibition." 557 F.2d at 463.

As the court's dicta in *Weinberger* suggests, a partner's interest in the outcome of any matter handled by his law firm is substantially greater than that of an associate or an employee. The partner's greater interest stems from the nature of the partnership relationship and its concomitant rights, duties, and liabilities. *See, e. g.,* Uniform Partnership Act §§ 6, 9, 11–15. The outcome of any proceeding handled by a law firm may affect the partners' financial interests as well as certain noneconomic interests, including the reputation and goodwill of the firm.

The language of section 455(b)(5)(iii) referring to "an interest" does not require that the interest of the judge's lawyer-relative be financial. *See SCA Services, Inc. v. Morgan,* 557 F.2d 110, 116 (7th Cir. 1977). Other provisions of section 455 make specific reference to financial interests; section 455(b)(4) includes references to both financial interests and "any other interest." Although the reporter's notes to Canon 3C of the Code of Judicial Conduct[9] suggest that only economic interests specifically require disqualification, the congressional drafters recognized that noneconomic interests may affect a judge's bias or prejudice. *See* E. Thode, *Reporter's Notes to Code of Judicial Conduct* 63, 66 (1973); Hearings on S. 1064 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 93d Cong., 1st Sess. 51–52, 106–108 (July, 1971–May, 1973).

■ Turning to the interest of Judge Hand's father in the outcome of the proceeding, the district court opinion states that during the time *Potashnick* was pending, Charles Hand received a one percent share of Hand, Arendall's income. The fee received by the firm in this case was based on a fixed hourly rate, and the fee was not affected by the outcome of the case. While Charles Hand's financial interest was not actually affected by the outcome of the case, we interpret section 455(b)(5)(iii) to require disqualification when the lawyer-relative's interest has the potential to be affected by the outcome. This case could have been handled on a contingent fee basis, or a favorable result might have justified a higher fee, so that Charles Hand's interest could have been affected by the outcome. Apart from the potential financial interests at stake, a win or loss in any lawsuit could affect a partner's interest in his firm's reputation, its relationship with its clients, and its ability to attract new clients. The language of section

---

9. Canon 3C of the Code of Judicial Conduct is substantially identical to 28 U.S.C. § 455 (1976).

455(b)(5)(iii) does not require the judge to investigate whether his lawyer-relative's interest will in fact be affected by the outcome of the proceeding. Instead, the statute requires automatic disqualification when the judge in a proceeding knows of his relative's interest, and the outcome of the proceeding may potentially affect that interest.

Underlying our decision to disqualify Judge Hand is the assumption that a partner will always have some interest which could be affected by the outcome of a proceeding handled by his law firm. However, a recent advisory opinion interpreting Canon 3C of the Code of Judicial Conduct suggests that apart from any interests involved, the partner status of the judge's relative by itself is sufficient ground for disqualification. Titled "Disqualification in a case in which a relative is employed by a participating law firm," the opinion notes the distinction between law firm associates and partners, and states:

> We believe the following conclusions find support in the Code [of Judicial Conduct]. A judge is disqualified and should recuse if a relative within the third degree of relationship to the judge or his spouse (a) is a partner in a law firm appearing in the case; *or* (b) will profit or lose from the judge's action in the case either financially or otherwise, for example, the reputation of the firm would be significantly affected by the litigation.

Advisory Committee on Judicial Activities, Advisory Opinion No. 58 (1978) (emphasis added). The use of "or" in the quoted language above indicates that either an interest or partner status of the relative will require disqualification. The advisory opinion, in conformity with our holding in this case, advocates automatic disqualification of a judge based on his relation to a law firm partner. While this result may seem harsh and inconvenient, we believe it will serve to promote public confidence in the integrity and impartiality of the judiciary in general and of the participating judge in particular.

## C. Waiver

In certain situations, disqualification can be waived. When the basis for disqualification is that the judge's "impartiality might reasonably be questioned," section 455(e) permits waiver after a full disclosure on the record of the grounds for disqualification. The judge may then continue to participate in the case. The statute prohibits the judge from accepting a waiver of his disqualification if it is based on the specific grounds set forth in section 455(b). For example, a small financial interest or a kinship within the third degree cannot be waived under the statute. At the time section 455 was amended, the Code of Judicial Conduct permitted waiver in the aforementioned two circumstances, but Congress believed that public confidence in the impartiality of federal judges would be enhanced by a stricter treatment of waiver. 1974 U.S.Code Cong. & Admin.News, pp. 6351, 6357. *See also* Frank, *Commentary on Disqualification of Judges—Canon 3C,* 1972 Utah L.Rev. 377.

██ This court has decided that Judge Hand was disqualified from participating in the *Potashnick* proceeding on two separate grounds. The judge's business dealings with Paul Brock constituted a ground for disqualification under section 455(a). Had the judge fully disclosed his relationship with Brock on the record, the parties could have waived this ground. During a pretrial conference with the attorneys Judge Hand stated that he was aware that remarks had been made suggesting that he would not be impartial due to his prior association as a partner in the Hand, Arendall law firm. The judge indicated he would favorably consider a motion to recuse himself made by any party. All of the attorneys involved asked Judge Hand not to recuse himself, since recusal would greatly delay trial of the case, all the lawyers knew of the prior association, the case had been on Judge Hand's docket since October 1973, and if any attorney had a question about the judge's impartiality a motion should have been filed previously. Under the express language of section 455(e), the pretrial conference proceedings cannot constitute a val-

id waiver. The judge's disclosure of his prior relationship with Hand, Arendall did not reveal the nature of his relationship to Paul Brock. The affidavits submitted as part of the motion to disqualify indicate that Port City's attorney did not discover the Brock-Hand connection until the trial was concluded, so that any waiver of disqualification would not apply to that ground.

Port City's motion to disqualify indicates that at the time of the assignment of the *Potashnick* action to Judge Hand's docket every attorney involved in the action, as well as the attorney in the transferred exoneration action, knew Judge Hand's father was the senior partner of Hand, Arendall. Notwithstanding their knowledge of Judge Hand's associations with Hand, Arendall, the attorneys involved not only did not file any motion asking the judge to disqualify himself from trying the cases, but in fact did not suggest disqualification when the judge more than once indicated he would accede to such suggestion.

The express language of section 455(e) dictates that a judge cannot accept a waiver of disqualification on section 455(b)(5)(iii) grounds, such as when a relative of the judge has an interest which could be affected by the outcome of the proceeding. Although section 455 places the obligation to disqualify with the judge, a litigant should not be permitted to utilize a disqualification issue as part of his trial strategy. The statute imposes, however, no duty on the parties to seek disqualification, nor any time limits within which disqualification must be sought. Although the Department of Justice recommended that section 455 include some limitation of time "to prevent applications for disqualification from being filed near the end of a trial when the underlying facts were known long before," Congress did not incorporate this recommendation. 1974 U.S.Code Cong. & Admin. News, pp. 6351, 6358; *see SCA Services, Inc. v. Morgan,* 557 F.2d 110, 117 (7th Cir. 1977).

We need not decide, however, whether a reversal on this ground alone would be foreclosed by Port City's failure to raise the issue of disqualification, or to even make an issue when invited to do so by the judge, until judgment was entered against it. The prior ground for reversal is sufficient to mandate a new trial. The unfairness and expense which results from disqualification in a case like this case can be avoided in the future only if each judge fully accepts the obligation to disqualify himself in any case in which his impartiality might reasonably be questioned.[10]

### III. Severance of the Consolidated Action

[11] Having determined that Judge Hand was disqualified from participating in the *Potashnick* action, we must decide whether our decision to reverse extends to the judgment entered in the exoneration action consolidated with *Potashnick* for trial.

As the facts indicate, U.S.F. & G. filed a petition for exoneration to ascertain its obligations under surety bonds covering agreements between Potashnick and Port City. U.S.F. & G. settled all but one of the labor and material claims asserted in the exoneration action. The remaining cross-claim and counterclaim of W. D. Brunson was transferred to Judge Hand's docket for further proceedings in consolidation with the *Potashnick* action. At the conclusion of trial, judgment was entered in favor of Brunson and against Port City and U.S.F. & G. Record, vol. 4, at 751.

Brunson argues on appeal that if Judge Hand is disqualified and the case reversed, this should not affect the judgment in his favor. Brunson's arguments are compelling. The exoneration lawsuit involves only U.S.F. & G., Port City and Brunson; Potashnick and his surety Continental are not parties to that action. Since the judge's disqualification stems from his relationship to Potashnick's counsel, the resulting rever-

---

10. Recognizing the considerable confusion surrounding the law of disqualification in the past, we emphasize the clear path of the future.

sal, Brunson asserts, should apply only to the action in which Potashnick is a participant. We agree with this assertion.

■ According to the trial court's findings of fact, Brunson's claim against Port City and U.S.F. & G. arose out of the construction of a clay blanket for the aerated lagoon project at issue in the main action. Brunson had initially subcontracted with Port City to perform all the work on the clay blanket item. After the initial construction method proved unsuccessful, however, Port City took over the spreading of the clay blanket, and Brunson merely delivered material to the jobsite. Port City's inefficient construction of the clay blanket resulted in an overrun of the material used, and Brunson sought recovery for the excess material he had provided. The trial court concluded that Brunson was entitled to recover from Port City for the balance due on the contract plus the additional amounts owed for the material overrun and for loading and hauling topsoil to the project. Port City was entitled to setoff against Brunson's recovery for the work done by Port City in spreading the clay blanket. Record, vol. 4, at 726–27, 748. Port City does not appeal from the judgment for Brunson entered against it. The amount of money Port City owes to Brunson is undisputed; rather, Port City contends that it is entitled to recover that amount from Potashnick, the prime contractor on the project. Because we are reversing the judgment in the main action tried by Judge Hand, we need not consider this issue which is raised in Port City's appeal from the judgment for Potashnick.

U.S.F. & G. was found liable to Brunson in the exoneration suit under the labor and material bonds on the prime contract between Potashnick and Port City, the parties to the main action. These bonds provided that U.S.F. & G. would pay for labor and materials incurred by Port City in the performance of its contract with Potashnick. U.S.F. & G. argues on appeal that the trial court erred in failing to discharge U.S.F. & G. from all liability on the bonds issued to Port City since the evidence shows Port City materially altered and departed from the terms of the original contracts, design, drawings, and specifications. Brunson contends that there were no material alterations in the plans and specifications relating to the clay blanket sufficient to discharge the surety.

The trial court made extensive findings of fact on the clay blanket issue and found that the method ultimately used for construction of the clay blanket was within the terms of the plans and specifications. Record, vol. 4, at 722. The court also found that there had been no material alterations of the contracts between Port City and Potashnick. Record, vol. 4, at 699. Our review of the record satisfies us that the trial court's findings of fact on the clay blanket and U.S.F. & G.'s bond liability are not clearly erroneous and should not be set aside. Fed.R.Civ.P. 52(a). We therefore affirm the trial court's judgment in favor of Brunson against Port City and U.S.F. & G.

Our affirmance of Brunson's judgment eliminates Brunson from retrial of an action in which he is only tangentially involved. The exoneration action was consolidated with *Potashnick* because Brunson's claim against U.S.F. & G. centered on the clay blanket operation, also an integral part of the main lawsuit. Unfortunately, the main lawsuit involved numerous other issues, and the consolidation changed Brunson's action from a one or two day proceeding to one lasting thirty-three days. Our reversal of the judgments in the main action stems from certain relationships between Judge Hand and the attorney for a party not involved in Brunson's lawsuit. We do not think Brunson should be forced to participate in a retrial of the main action because the judge was disqualified in the prior action with which his suit was consolidated.

■ We recognize that in affirming Brunson's judgment, we decide the question of U.S.F. & G.'s bond liability for the clay blanket construction, which is also an issue in the main action to be retried. Absent exceptional circumstances, our decision on

this specific issue becomes the law of the case in any subsequent retrial. *See Schwartz v. NMS Industries, Inc.,* 575 F.2d 553, 554–55 (5th Cir. 1978); *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir. 1967). We do not, however, think our partial affirmance on this one narrow issue will bear significantly on the retrial of the numerous other claims in this case.

## IV. The Right to Retain Hired Counsel in a Civil Case

On the fourth day of the trial of this action, during a break in the first witness' testimony, Judge Hand announced:

> During recess and breaks, while a witness such as Mr. Jenkins is on the stand, I do not think it appropriate for counsel to have further discussions with the witness until he has completed his testimony. And, I want to make sure that everybody understands that as part of the Court's instructions. Once he has commenced his testimony, I think it is highly improper for counsel to have any further conversations with that witness until he has completed his testimony.

Record, vol. 13, at 652–53.

During the course of trial, counsel for defendant Port City violated the judge's rule by conferring with B. G. Quinnelly, sole stockholder and president of Port City, during a recess in Quinnelly's testimony. Port City's counsel had not understood the rule to prohibit an attorney from conferring with his own client during breaks and recesses in the client's testimony. As a result of Port City's misunderstanding and subsequent violation of the rule, it was forced to choose among 1) having a mistrial declared, 2) excluding any further testimony by B. G. Quinnelly, or 3) proceeding without a jury. Port City chose to proceed without a jury, and now argues that Judge Hand's rule

violated Port City's constitutional right to retain hired counsel and resulted in the loss of its right to trial by jury.

There is a paucity of authority dealing with the existence of a right to counsel in civil cases.[11] This lack of precedent is due in part to the historical development of the right to counsel in criminal cases. Prior to 1836, the English system recognized the right of accused criminals to be represented by counsel in the trial of less serious crimes, while denying representation to alleged felons. *See Powell v. Alabama,* 287 U.S. 45, 60, 53 S.Ct. 55, 77 L.Ed. 158 (1932); Beaney, *The Right to Counsel in American Courts,* 8–9 (1955).

In view of the anomalous procedures in British criminal courts, it is not surprising that the framers of the American Constitution specifically provided for a right to retain counsel in criminal prosecutions. Because English practice had recognized the right to retain civil counsel, there was no need to reaffirm the prerogative. Therefore, the sixth amendment's rejection of the English criminal practice does not represent the denial of a right to retain counsel in civil litigation. The existence of such a right has, indeed, been generally assumed in the American legal system.

Note, The Right to Counsel in Civil Litigation, 66 Colum.L.Rev. 1322, 1327 (1966).

█ Although there do not appear to be any civil cases on this point, the Supreme Court has indicated in its criminal decisions that the right to retain counsel in civil litigation is implicit in the concept of fifth amendment due process. *See, e. g., Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Cooke v. United States,* 267 U.S. 517, 537, 45 S.Ct. 390, 69 L.Ed. 767 (1925). The right develops out of the principle that notice and hearing are prelimi-

---

11. The brief of R. B. Potashnick and Continental Casualty Company as appellees cites *Barker v. Hardway,* 283 F.Supp. 228, 237 (S.D.W.Va.), aff'd, 399 F.2d 638 (4th Cir. 1968), *cert. denied,* 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1969) and *Suess v. Pugh,* 245 F.Supp. 661, 665 (N.D.W.Va.1965) for the proposition that there is no constitutional right of counsel in civil

cases. Neither of the cited cases involve a courtroom judicial proceeding. In *Barker* the right to counsel was denied to students at a school disciplinary hearing; in *Suess* the right was denied to a Veteran's Administration physician appearing before a Professional Standards Board.

nary steps essential to the passing of an enforceable judgment and that they constitute basic elements of the constitutional requirement of due process of law. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Powell v. Alabama,* 287 U.S. 45, 68, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Historically and in practice, the right to a hearing has always included the right to the aid of counsel when desired and provided by the party asserting the right. *Powell v. Alabama,* 287 U.S. 45, 68, 53 S.Ct. 55, 77 L.Ed. 158 (1932). "If in any case, *civil or criminal,* a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." 287 U.S. at 69, 53 S.Ct. at 64 (emphasis added); *accord, Roberts v. Anderson,* 66 F.2d 874 (10th Cir. 1933); *Rex Investigative and Patrol Agency, Inc. v. Collura,* 329 F.Supp. 696, 699 (E.D.N.Y.1971).

▆▆ Recognizing that a civil litigant has a constitutional right to retain hired counsel, we hold that Judge Hand's rule prohibiting a litigant from consulting with his attorney during breaks and recesses in the litigant's testimony impinges upon that right. We draw our support from *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). In *Geders* a trial court order prevented the defendant in a federal criminal prosecution from consulting his attorney "about anything" during a seventeen hour overnight recess in the trial between his direct and cross-examination. The Supreme Court held that the trial court order impinged upon defendant's sixth amendment right to the assistance of counsel. 425 U.S. at 91, 96 S.Ct. 1330.

▆▆ We note at the outset that certain distinctions can be made between the rights of civil litigants and those of criminal defendants. A criminal defendant's right to counsel arises out of the sixth amendment, and includes the right to appointed counsel when necessary. *See, e. g., Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32

L.Ed.2d 530 (1972); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55 (1932). A civil litigant's right to retain counsel is rooted in fifth amendment notions of due process; the right does not require the government to provide lawyers for litigants in civil matters. *Hullom v. Burrows,* 266 F.2d 547 (6th Cir.), *cert. denied,* 361 U.S. 919, 80 S.Ct. 262, 4 L.Ed.2d 187 (1959); *McGaughy v. Gardner,* 296 F.Supp. 33, 36 (E.D.La.1967). A criminal defendant faced with a potential loss of his personal liberty has much more at stake than a civil litigant asserting or contesting a claim for damages, and for this reason the law affords greater protection to the criminal defendant's rights.

Notwithstanding the civil-criminal dichotomy, an analogy can be drawn between the criminal and civil litigants' respective rights to counsel. In both cases the litigant usually lacks the skill and knowledge to adequately prepare his case, and he requires the guiding hand of counsel at every step in the proceedings against him. *See Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932). In each instance, the right to counsel is one of constitutional dimensions and should thus be freely exercised without impingement. The *Geders* decision emphasizes the importance of permitting communication between attorney and client during trial recesses.

> It is common practice during such [overnight] recesses for an accused and counsel to discuss the events of the day's trial. Such recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed. The lawyer may need to obtain from his client information made relevant by the day's testimony, or he may need to pursue inquiry along lines not fully explored earlier. At the very least, the overnight recess during trial gives the defendant a chance to discuss with counsel the significance of the day's events. Our cases recognize that the role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and

deal with the trial process without a lawyer's guidance.

425 U.S. at 88, 96 S.Ct. at 1335. The need for attorney-client communication is certainly no less in a civil case.

In *Geders,* as in the instant case, the trial court's controverted order was imposed to avoid possible "coaching" of witnesses. The *Geders* Court noted several alternative ways to avoid improper influences on testimony but concluded that "[t]o the extent that conflict remains between the defendant's right to consult with his attorney during a long overnight recess in the trial, and the prosecutor's desire to cross-examine the defendant without intervention of counsel, with the risk of improper 'coaching,' the conflict must . . . be resolved in favor of the right to the assistance and guidance of counsel." *Id.* at 91, 96 S.Ct. at 1337. The Court in *Geders* specifically limited its decision to the particular circumstances before it—an order preventing attorney-client consultation "about anything" during a 17-hour overnight recess. 425 U.S. at 91, 96 S.Ct. 1330. Judge Hand's rule in the instant case similarly prohibited "any further conversations" with a witness once his testimony commenced, and the application of the rule barred the president and sole shareholder of defendant Port City from talking to his attorney for a period of seven days, including several overnight recesses. Judge Hand's denial of any attorney-client communication for such an extended period of time resulted in a significant deprivation of the effective assistance of counsel and thus impinged upon Port City's constitutional right to retain counsel.

[redacted] Counsel for Potashnick argues that Judge Hand's rule did not deny any party its right to counsel because defendant Port City is a corporation, and the judge's rule applied only to bar communication between counsel and the corporation's president testifying as a *non-party* witness. We recognize that Port City Construction Company is the named defendant in this case. However, we find that B. G. Quinnelly's position as president and sole shareholder of Port City required him to act for the corporation in the attorney-client relationship so as to afford him client status. *See Natta v. Hogan,* 392 F.2d 686 (10th Cir. 1968); *City of Philadelphia v. Westinghouse Electric Corp.,* 210 F.Supp. 483 (E.D.Pa.1962).[12]

[redacted] We hold that the judge's rule pertaining to attorney-client communication impinged on Port City's due process right to retain counsel. This violation of a constitutional right constitutes a ground for reversal of the judgment in this case. Because Port City waived its right to jury trial only to avoid the harsher alternatives (mistrial or exclusion of Quinnelly's testimony) resulting from its violation of the judge's rule, Port City should not be held to its waiver in any subsequent retrial.

[redacted] Because we are reversing the judgment in this case on a second ground unrelated to the disqualification issue, we must again determine whether this reversal extends to the judgment entered in the exoneration action consolidated with *Potashnick* for trial. We find that it does not.

Both Port City and B. G. Quinnelly were named defendants in the amended bill of

12. *Natta* and *Westinghouse* deal with the question of whether a corporate agent's communications qualify as the corporate client's communications to enable the corporation to invoke the attorney-client privilege. The test of client status formulated by the courts is membership in the "control group" authorized to make decisions for the corporation with respect to the legal matter about which the attorney is consulted. In other words, the test as to which corporate officers and employees are in a position to speak for the company within the meaning of the word "client" is whether the person has the authority to control, or substantially participate in, a decision regarding action to be taken on the advice of a lawyer, or is an authorized member of a group that has such power. *Natta v. Hogan,* 392 F.2d 686, 692 (10th Cir. 1968). Although the attorney-client privilege is not at issue in the instant case, we find the test for "client" status set forth in *Natta* to be applicable here as an aid in determining whether B. G. Quinnelly should be viewed as a party constitutionally entitled to retain counsel. Since Port City is a corporation which can act only through its officers and agents, and because Quinnelly represents the corporation and acts as "client" in the attorney-client relationship, we think the corporate party's right to counsel must be extended to B. G. Quinnelly.

exoneration filed by U.S.F. & G. By the time the action was consolidated with *Potashnick,* however, judgments had already been entered in favor of U.S.F. & G. against Port City and B. G. Quinnelly. The only controversy remaining in the action involved W. D. Brunson's cross-claim against Port City and its counterclaim against U.S.F. & G. After trial of the main and consolidated actions, judgment was entered in favor of Brunson against Port City. Port City does not appeal from this judgment; rather, Port City contends that it is entitled to recover from Potashnick the amount it admittedly owes Brunson.[13] Because Port City, the party claiming a violation of its constitutional right to counsel, does not take issue with the judgment against it in Brunson's favor, we again affirm the judgment in the consolidated action.

### V. Issues Not Decided

The parties to this appeal raise several other issues going to the merits of the case. They dispute, *inter alia* :

1) whether Potashnick made an implied warranty of sufficiency of the plans and specifications to Port City and whether such warranty was breached;

2) whether there were material alterations of and departures from the bonded contracts sufficient to discharge the surety U.S.F. & G. from liability on its bonds;

3) the interpretation of the October 25, 1972 letter agreement between Potashnick and Port City and the exclusion of evidence concerning the agreement;

4) the award to Potashnick of recovery over against the City for extra work performed by Port City;

5) the award to Potashnick of prejudgment interest on the amounts owed by the City for retainages withheld and the unpaid balance on the contract;

6) the denial to the City of recovery against Potashnick for attorney's fees and expenses; and

7) whether there was a conflict in substantial evidence to create a jury question if the case had been tried to conclusion before the jury.

Because this case must be retried before a different judge, and because it may be retried before a jury, it would serve no purpose for us to decide these issues on this appeal.

### VI. Conclusion

Unable to bring this lengthy litigation to an end, we reluctantly reverse the judgment in *Potashnick v. Port City Construction Co.* and order the case to be retried before a new judge and jury. We affirm the judgment in the consolidated action of *United States Fidelity and Guaranty Co. v. Brunson.*

---

**13.** The absence of any controversy between W. D. Brunson and Port City is evidenced by B. G. Quinnelly's testimony at trial that "I don't have any argument with Mr. Brunson. He is noted to be the best dirt hauler in the City and that is the reason I chose him." Record, vol. 21, at 4861.