R. Stuart HUFF, as Trustee,
Plaintiff-Appellant,

v.

STANDARD LIFE INSURANCE COM-
PANY, a Mississippi corporation,
Defendant-Appellee.

No. 81–5326.

United States Court of Appeals,
Eleventh Circuit.

Aug. 26, 1982.

R. Stuart Huff, pro se.

Fleming, O'Bryan & Fleming, William O'Bryan, John P. Kelly, Fort Lauderdale, Fla., for defendant-appellee.

Before FAY, VANCE and ARNOLD *, Circuit Judges.

FAY, Circuit Judge:

Insurance and the complications of applications, premiums, receipts, and beneficiaries form the foundation of this action to recover the proceeds on a one million dollar life insurance policy. The plaintiff, R. Stuart Huff,[1] appeals from a directed ver-

---

* Honorable Richard S. Arnold, U. S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. As will be seen by a reading of the facts, the plaintiff assumes several roles in the background and litigation of this case. First, R.

Stuart Huff was trial counsel in the District Court and continues to represent himself during this appeal. Second, he is the plaintiff suing in his capacity as trustee of the insurance

dict in favor of the defendant insurer. Three issues have been presented for our review: (1) whether the district court judge should have recused himself; (2) whether the District Court erred in denying plaintiff's motion for summary judgment; and (3) whether the District Court improperly directed a verdict in favor of the defendant. We find the first two issues meritless, but find error in the District Court's conclusion that the sight draft tendered as payment of the first premium was dishonored. Because this erroneous conclusion resulted in the granting of a directed verdict for the defendant, the case is reversed and remanded.

Although the parties in this case failed to agree on a pretrial stipulation of the facts, the underlying facts are not in dispute. Through a mutual friend, the decedent, Mr. Alejandro J. Torres-Ciliberto,[2] was introduced to Mr. Darlow, a certified life insurance underwriter and general agent for the defendant, Standard Life Insurance Company. On May 31, 1978, Mr. Torres applied for a life insurance policy in the amount of one million dollars. According to Darlow's testimony, he informed Mr. Torres that the insurance would be effective upon completion of "the requirements of the application so long as he would have been acceptable to the company." Record, vol. II, at 138. The following day Mr. Darlow visited Mr. Torres's office, obtained a sight draft drawn on a foreign corporation and financial statements on that corporation, and gave Mr. Torres's secretary a receipt (originally attached to the application) acknowledging receipt of the three thousand dollar quarterly payment.

Mr. Torres completed the requisite medical examinations on July 12 and August 9, 1978, respectively. Five days later on August 14, 1978, Mr. Torres died of a gunshot wound accidentally inflicted by his bodyguard. No policy had been issued at this time nor had the company received the results of Mr. Torres's second medical examination. Thus the "effective" date of the policy became the "triggering" factor critical to the determination of insurance coverage.

Meanwhile, the sight draft obtained from Mr. Torres on June 1, 1978, travelled a long and winding course in search of payment.[3] Although the draft had been processed through the bank's foreign collections department, it had not been paid prior to Mr. Torres's death. On August 15, 1978, Standard Life Insurance Company wrote to Mr. Darlow informing him that Torres's policy had never taken effect. "No policy was ever issued and accepted by applicant and no insurance took effect under the conditional receipt because, among other things, there had been no payment. The check offered as payment never was honored by the bank so there is no money to return." Letter from W. S. Beckwith to Martin Darlow (Aug. 15, 1978); record, vol. IV, at 175. On September 22, 1978, the plaintiff obtained a cashier's check drawn on trust account funds and sent it to the insurer's bank, which had continued its efforts to collect on

proceeds held in trust for the mother of the deceased under an assignment from a Venezuelan corporation. Third, Mr. Huff is the attorney for the foreign corporation upon which the "infamous" sight draft was drawn as intended payment of the first premium. Fourth, he secured a cashier's check drawn on the foreign corporation's funds in his trust account in an attempt to finalize payment on the sight draft after the applicant's death.

**2.** The decedent will subsequently be referred to as Mr. Torres. He was 24 years old and occupied the status of a foreign national when he applied for insurance.

**3.** The draft was deposited in the defendant's bank as a regular check. The bank returned it and the defendant resubmitted it to the foreign collections department of another bank. The bank was unable to locate the bank named on the draft in Panama, but suspected that perhaps a large Venezuelan bank possessing the same name had opened a branch office in Panama. The bank sent the draft to the post office box indicated on the face of the draft. At the time of trial no one knew the whereabouts of the draft despite two tracers sent by the bank.

the original sight draft.[4] The insurer directed the bank to return the check and refused to accept it as payment of the draft.

It is at this juncture the dispute began. The plaintiff filed the complaint alleging the facts as set forth above and that "[a]ll conditions precedent to payment of the proceeds under the policy [had] been performed." Record, vol. I, at 5. The defendant moved to dismiss the complaint and averred the plaintiff had failed to allege facts binding the defendant on a contract of insurance and that "no policy was to be issued by the Defendant until it had investigated all aspects of the application, and there is no allegation that such investigation had been completed, and that the Defendant was satisfied that it was willing to insure the life of the deceased." *Id.* at 14. The trial court denied the motion. The defendant subsequently answered the complaint. In its answer, the defendant admitted the existence of the application and the sight draft, and the death of the applicant. The defendant did, however, specifically point out that the sight draft was never honored, never generated funds, nor was its present location known. The defendant denied that Mr. Huff had "any interest in or any right to recover any sums of money...." *Id.* at 29. Further, the defendant denied the existence of any insurance on the date of Mr. Torres's death.

Unable to agree on a pretrial stipulation, the defendant filed a unilateral stipulation in which it listed the factual issues to be litigated as: (1) the plaintiff's right to maintain the action; (2) the identity of the intended beneficiary; (3) the existence of consideration for the conditional receipt; and (4) whether Mr. Torres was a *risk acceptable* to the company. As issues of law for the court, the defendant listed (1) the plaintiff's right to bring the action due to his dual role as plaintiff, by virtue of a trusteeship, and attorney; (2) the validity of the alleged assignment; and (3) the ramifications of the plaintiff's attempt to satisfy the obligation of the sight draft by subsequent substitution of a cashier's check after the applicant's death.

At trial the plaintiff presented two witnesses, the insurance agent, Mr. Darlow, and Robert G. Gillespie, Jr., senior vice president and general counsel of Standard Life Insurance Company. Mr. Darlow testified to the circumstances surrounding the application, receipt of the sight draft, and the communication which took place at the time of Mr. Torres's death. Mr. Gillespie's testimony concerned the company's decision to deny coverage and its subsequent communication of this information to Mr. Darlow. The documentary evidence consisted of the insurance application, a facsimile of the conditional receipt given to Mr. Torres,[5] the company's letter denying the existence of any insurance, and the claimant's statement.[6]

---

4. Deposition testimony from Fred Neil, Vice President and Manager of the International and Collection Exchange Department of Deposit Guaranty National Bank, indicated that the bank had continued to seek collection on the sight draft prior to receipt of the cashier's check and had not been instructed by Standard Life to discontinue its efforts.

5. The trial judge admitted a receipt which contained language identical to that contained in the receipt given to Mr. Torres's secretary upon delivery of the sight draft. The original receipt could not be found.

6. The trial judge, after a lengthy bench conference, ordered the separation of the claimant's statement from the attached assignment under which Mr. Huff claimed his right to bring this action. The appellant claims the assignment should not have been excluded, and that the trial judge based his decision to exclude solely on the fact that it had not been separately listed on the plaintiff's exhibit list. As the plaintiff correctly points out, the assignment had always been attached to the claimant's statement and thus it took the form of one document for listing purposes. However, the transcript reveals that the trial judge relied on the *plaintiff's* view that the assignment was of "no evidentiary value" in sustaining the defendant's objection to its admission. Record, vol. II, at 202. We suggest the significance of the assignment as evidence and as a disputed issue be determined prior to a retrial of this case.

At the close of the plaintiff's case, the defendant moved for a directed verdict.[7] The defendant articulated four bases upon which to grant the motion: (1) plaintiff's failure to establish Mr. Huff's right to bring suit; (2) his "failure to show any evidence" of consideration for the insurance policy; (3) his failure to prove the existence of effective insurance; and (4) his failure to show that Mr. Torres was a *risk acceptable* to Standard Life Insurance Company as specified in the conditional receipt. The plaintiff continued to argue that the defendant had failed to deny the satisfaction of conditions precedent with particularity and specificity, that this failure had alleviated his burden of proof as to them, and that the receipt established a prima facie case of payment. The trial judge agreed to a certain extent, but found that:

> whatever prima facie case Plaintiff established at that time certainly was vitiated by the documentary exhibit ... stating that "no insurance took effect under the conditional receipt because, among other reasons, there has been no payment. The check—" which is certainly loose language on the part of the Defendant—"offered as payment never was honored by the bank so there is no money to return."

Record, vol. II, at 237–38. The court directed the "verdict on the issue of non-payment, failure of the sight draft—dishonorment ... of the sight draft." *Id.* at 239.

*The Problem with a D. V.*

 Directed verdicts "should be granted only when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict." *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1371 (5th Cir. 1982) (en banc). *Accord, Johnson v. Bryant*, 671 F.2d 1276

(11th Cir. 1982). In making this determination, the court must consider *all* of the evidence, look at it in the light most favorable to the non-moving party, and make all reasonable inferences in its favor. The existence of substantial evidence to support the opposing party's theory mandates the denial of a motion for directed verdict. "Substantial evidence" has been defined as "evidence of such quality and weight that reasonable and fairminded persons in the exercise of impartial judgment might reach different conclusions...." 665 F.2d at 1371. We find the evidence in this case was of such quality and weight.

The trial court concluded that the sight draft had been *dishonored*, but both parties agreed that a cashier's check had been tendered in payment of the draft. The plaintiff produced evidence to show that a receipt had been given the decedent in exchange for the $3,000 sight draft. The receipt stated that it was not to be detached unless settlement toward the first premium was made at the time of application. Thus, the receipt raised a presumption of payment. Because the directed verdict occurred at the close of the plaintiff's case, the defendant never produced evidence to rebut this presumption. Thus, in granting the directed verdict the trial judge relied on a letter introduced by the plaintiff in which the insurance company denied the existence of insurance for lack of payment. This letter alone, however, does not eradicate the evidence produced in support of the plaintiff's case. We cannot say, therefore, that "reasonable and fairminded persons ... might [not] reach different conclusions" regarding the issue of payment. For this reason, we find the granting of the directed verdict based on the dishonorment of the check to have been improper.

To be sure, the trial court was faced with the difficult task of applying Florida's law

---

7. The appellant premises his presentation of scant evidence on an alleged failure of the defendant to raise issues in his pleadings. Relying on Federal Rule of Civil Procedure 9(c), the appellant argues that the defendant failed to "specifically" contest the satisfaction of conditions precedent; such as, whether the applicant was an insurable risk. He also argues that the validity of the assignment was never put into issue. We have reviewed the record and find the defendant sufficiently placed these facts in issue.

on presumptions which we have found to be somewhat less than a model of clarity in this area. First, Florida's rules on presumptions complicated the burden of proof issue.[8] Generally, Florida follows the "bursting bubble" theory of presumptions or the "Thayerian rule." Under this theory, "when credible evidence comes into the case contradicting the basic fact or facts giving rise to the presumption, the presumption vanishes and the issue is determined on the evidence just as though no presumption had ever existed." *Nationwide Mutual Insurance Co. v. Griffin*, 222 So.2d 754, 756 (Fla.App.1969). *Caldwell v. Division of Retirement, Florida Department of Administration*, 372 So.2d 438, 440 (Fla. 1979). *See also, Cooper v. Wolkowitz*, 375 So.2d 1099, 1101 (Fla.App.1979). Accordingly, the receipt gave rise to the presumption of payment, only to vanish at the introduction of the insurance letter denying payment had been made. Even though the presumption vanished, the conflicting evidence on the issue of payment deserved a factual determination by the jury.

The need for a credibility decision by the jury is further bolstered by Florida case law which appears to place the burden of rebutting the presumption of payment on the insurer. *American Home Mut. Life Ins. Co. v. Gibson*, 72 So.2d 374, 375 (Fla.1954). In *Gibson* the Florida Supreme Court ap-proved a ruling in which the trial court held "that possession of the policy at the time of his death by the insured raises the presumption that the first premium was paid; further, that the burden of establishing nonliability on account of the failure to pay the first premium is on the [insurer]."[9] *Id.* at 375.

There is a clear distinction between possession of the issued policy in *Gibson* and the possession of a conditional receipt in the case before us. Nevertheless, in light of this authority and the existence of contradictory evidence in this case regarding the issue of payment, we are compelled to reverse and remand for a new trial in which the jury may properly weigh the conflicting evidence.[10]

*The Untouched Issue*

Aside from the issue of payment, the defendant has also raised an interesting argument as to whether the applicant was an insurable risk. The terms of the conditional receipt required "the Proposed Insured and the Applicant ... [to be] on the Date of Issue *risks acceptable* to the Company under its rules, limits and standards...." Plaintiff's Exhibit # 7 (emphasis supplied). Relying on Florida case law, which denies the existence of "interim" insurance, the defendant contends that no insurance could have taken effect until the

---

**8.** Fed.R.Evid. 302 provides: "In civil actions and proceedings, the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with State law."

**9.** In fact, the Florida Supreme Court upheld a directed verdict in favor of the insured because it found the evidence submitted by the insurer insufficient to rebut the presumption of payment.

**10.** Additionally, the unique nature of the sight draft tendered requires special consideration. This particular draft was drawn on a Venezuelan corporation and addressed to Banco Venezolano Del Caribe Ltd., Apartado 2320, Panama 9–A.R.P., which required handling through foreign collections. Unlike a check, the sight draft was "payable at sight or on presenta-tion." Fla.Stat. § 673.108 (1981). It is dishonored when "[a] necessary or optional present-ment is duly made and due acceptance or payment is refused or cannot be obtained within the prescribed time or in case of bank collections the instrument is seasonably returned by the midnight deadline." Fla.Stat. § 673.507 (1981). The record reflects that the draft had been sent to the address indicated, but had "not been returned to the bank, nor [was] its present whereabouts established." Record, vol. I, at 46. Under such circumstances and the absence of evidence to establish present-ment, it cannot be said that the sight draft was dishonored under Florida's statutory definition of dishonorment. Indeed, after notification of the negative results of the second tracer, the plaintiff attempted to tender payment by means of a cashier's check.

insurer determined whether the applicant qualified as a risk acceptable to the company.

Under Florida law, which applies to issues of policy construction, the basic rule is: where there is an ambiguity such that two (or more) reasonable interpretations can fairly be made, the court will choose that interpretation favoring the insured.... However, where the terms are clear and unambiguous or only one logical interpretation consistent with the intent of the parties exists, the court must give the policy that meaning.

*Ideal Mutual Insurance Co. v. C.D.I. Construction, Inc.*, 640 F.2d 654, 657 (5th Cir. 1981) (citations omitted). Neither party questions the language of the conditional receipt nor is there a contention of ambiguity. Thus, the District Court should examine the receipt and give its language the "one logical interpretation" it warrants.

This is perhaps more easily said than done for the language contained in similar policies which have already undergone judicial interpretation vary to some degree. These variances in policy language make it difficult to find a clear rule of interpretation. In *Peninsular Life Insurance Co. v. Rosin*, 104 So.2d 792 (Fla.App.1958), the conditional receipt premised its effective date on approval of the application by the home office. In reversing a trial court's finding that the receipt established interim insurance from the date of the applicant's medical examination, the court stated:

It is well known that insurance companies take many factors into consideration before issuing large contracts of insurance, such as the moral like of the applicant, his habits, amount of insurance carried, and many other factors, on which the medical examination has no bearing, and these factors are reserved by the company for independent investigation before the contract is accepted.

*Id.* at 797.

In *Suarez v. Southland Life Insurance Co.*, 158 So.2d 536 (Fla.App.1963), the same court encountered language closer to that contained in the present receipt. The receipt in *Suarez* required the home office to be satisfied that the "proposed insured was acceptable under the rules, limits and standards of the Company." *Id.* at 537. The court affirmed a dismissal of an action by a beneficiary based on the conditional receipt. The court found that it did not appear that the insurer's officers "were satisfied that the proposed insured was acceptable...." *Id.*

In *Cliborn v. Lincoln National Life Insurance Co.*, 332 F.2d 645 (10th Cir. 1964), the Tenth Circuit confronted language virtually identical to that in issue here. The court labelled the receipt as the "insurable type,"[11] which requires conditions to be met prior to the extension of coverage. The conditions in Cliborn included that the proposed insured be a "risk acceptable to the Company." The trial court had dismissed the action ruling that it was necessary for the plaintiff to prove the decedent had been a risk acceptable to the insurer. The Tenth Circuit affirmed. "Since the conditions were not met, no insurance was in force at the time the applicant died." *Id.* at 647.[12]

The District Court did not address this issue when directing the verdict in this case, but based his decision solely on the issue of payment. Our remand will, however, allow the District Court the opportunity to inter-

---

11. We acknowledge that the receipts in *Rosin* and *Suarez* take the form of "approval" types distinguished by the Tenth Circuit in *Cliborn* from the insurable type presently in issue. Nevertheless, we believe the Florida court's rulings in those cases will be helpful to a proper interpretation of the conditional receipt in this action.

12. The conditional receipt further required the Proposed Insured and the Applicant be "in good health on the Date of Issue." Plaintiff's Exhibit # 7. While it might have been argued that this condition was not satisfied due to the death of the proposed insured, this argument has since been laid to rest by the Fourth District Court of Appeal in *LaQuay v. Union Fidelity Life Insurance Co.*, 403 So.2d 1359 (Fla.App. 1981).

pret the relevant language of the conditional receipt.[13]

*To Recuse Or Not To Recuse*

The plaintiff devoted nineteen pages of his initial brief to the recusal issue. Our disposition of the matter requires far less verbiage.

■ Prior to trial the plaintiff filed a motion to recuse based upon the trial judge's previous affiliation with the defendant's law firm. Since the trial the plaintiff has supplemented his plea with a list of adverse rulings made during the course of the trial. He asserts the judge was biased, personally hostile, and that he prejudged the case prior to trial. We have read the trial transcript, evaluated the judge's prior relationship with the defense firm, and considered the case law in this volatile area. We find the facts insufficient to necessitate recusal.[14]

First, "a motion for disqualification ordinarily may not be predicated on the judge's rulings in the instant case or in related cases, nor on a demonstrated tendency to rule any particular way, nor on a particular judicial leaning or attitude derived from his experience on the bench." *Phillips v. Joint Legislative Committee on Performance and Expenditure Review*, 637 F.2d 1014, 1020 (5th Cir. 1981). Despite the numerous adverse rulings and comments set forth by the plaintiff as exemplary of the judge's bias, we do not find them so persuasive as to constitute personal bias against a party. *United States v. Phillips*, 664 F.2d 971, 1003 (5th Cir. 1981). "At worst, these remarks were off-hand statements by the court in a completely judicial context...." *Parliament Insurance Co. v. Hanson*, 676 F.2d 1069, 1075 (5th Cir. 1982).

Second, the plaintiff primarily relies on general language extracted from *Potashnick v. Port City Construction Co.*, 609 F.2d 1101 (5th Cir. 1980), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). This language, however, must be read in the context of the facts before that court. In *Potaschnick*, the trial judge maintained investment interests with defense counsel and in fact signed a personal business document given to him by the defense lawyer as he entered judgment on the case before him. The trial attorney also represented the judge in other matters. Furthermore, the judge's father was the senior partner of the law firm representing the defense. The movants did not, however, allege bias, but rather questioned the appearance of impartiality. The court held that these factors mandated disqualification under 28 U.S.C. § 455(a).

"Clearly, the goal of the judicial disqualification statute is to foster the *appearance of impartiality*." *Id.* at 1111. In *Potashnick*, the court adopted a "reasonable" person test for determining when the appearance of lack of impartiality might occur. The reasonable person is presumed to possess knowledge of all the circumstances. The plaintiff contends that in this case the circumstances include an awareness of a judicial poll in which the trial judge received unfavorable scores. Combining the reasonable person's knowledge of this poll with the judge's adverse rulings and comments, and his former association with defense counsel, the plaintiff hopes to persuade us that a reasonable person "would harbor doubts about the judge's impartiality." We are not persuaded.

Unlike the judge in *Potashnick*, the trial judge in this case did not participate with

13. Upon remand, the District Court will also be afforded the opportunity to rule on the validity of the assignment to Mr. Huff. Apparently, the application for insurance specified a Florida corporation as the intended beneficiary, but the assignment was made by a Venezuelan corporation of the same name. The defendant contests the validity of the assignment and contends the plaintiff lacks capacity to sue.

14. 28 U.S.C. § 455(a) (1976) provides: "Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

defense counsel in outside business ventures; he was not personally represented by defense counsel; nor did any member of the judge's family retain any relationship with his former law firm. While it is true that the judge did associate with and was a partner of the firm prior to appointment to the bench, this does not create the same risk of impartiality found in *Potashnick.*

"[T]he protection of the integrity and dignity of the judicial process from any hint or appearance of bias is the palladium of our judicial system." *Id.* at 1111 (quoting *United States v. Columbia Broadcasting System, Inc.,* 497 F.2d 107, 109 (5th Cir. 1974)). But the circumstances surrounding the present action do not jeopardize the image of our judicial system. Disqualification is committed to the sound discretion of the trial judge. *Phillips,* 637 F.2d at 1021. Absent an abuse of that discretion, we decline to second guess the District Court. We find no such abuse under the facts presented.

REVERSED and REMANDED.[15]

---

**15.** Upon remand, we suggest the parties make an effort to secure a true pretrial conference in which the District Court may dispose of some of the difficulties encountered during the trial on evidentiary matters. Because we have found a disputed issue of material fact on whether payment actually took place, the plaintiff's contention that he was entitled to a summary judgment has lost its merit. It therefore warrants no further discussion.