**Sol WINN, Plaintiff–Appellant,**

v.

**EDNA HIBEL CORPORATION, Defendant–Appellee.**

No. 87–5382.

United States Court of Appeals, Eleventh Circuit.

Oct. 28, 1988.

---

Dennis A. Nowak, Kirkpatrick & Lockhart, Jeffrey A. Tew, Miami, Fla., for plaintiff-appellant.

Kenneth A. Marra, Nason, Gildan, Yeager & Gerson, P.A., Nathan E. Nason, West Palm Beach, Fla., for defendant-appellee.

Before TJOFLAT and HILL, Circuit Judges, and HALL *, District Judge.

TJOFLAT, Circuit Judge:

In this case, a manufacturer of artwork terminated a dealership which was selling its artwork for less than the manufacturer's suggested retail prices. The dealer sued the manufacturer for money damages under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1982), claiming that the manufacturer terminated him pursuant to a conspiracy between the manufacturer and a competing dealer.

The case came on for trial, and at the close of the plaintiff's case the court granted the manufacturer a directed verdict on two grounds: first, the dealer's evidence failed to exclude the possibility that the manufacturer acted independently in terminating the dealership; second, the dealer failed to prove any economic loss.[1] We affirm.

## I.

The Edna Hibel Corporation (Hibel), the appellee, manufactures various forms of artwork, such as collector plates and lithographs, created by Edna Hibel. Hibel sells this artwork through non-exclusive dealerships which are terminable at will. Sol Winn, the appellant, became an authorized Hibel dealer in 1976. Originally, he operated out of his residence in New York City; shortly thereafter, he moved his residence and dealership to Monticello, New York. Once in Monticello, Winn began to compete with Elegante Shoppes (Elegante), another Hibel dealer located there. Among other things, Winn sold Hibel products at prices lower than those on Hibel's suggested price list to which Elegante adhered. Elegante soon began to complain to Hibel about Winn's price cutting.

Winn knew that Hibel had a strong interest in maintaining its suggested retail pricing structure. Its products were collectors' items, and those who purchased them did so in part because over time they appreciated in value. Hibel discouraged all of its dealers from price cutting so as not to downgrade the market for its products.

After Elegante began complaining about Winn's discount selling, Hibel reminded Winn about the need to maintain its image and, in the process, sent Winn a copy of a letter it had recently written to a dealer in Golden, Colorado, stating that it would not allow the discounting of Hibel's products.

Notwithstanding Hibel's admonishment, Winn continued to cut prices. On one occasion Winn sent some Hibel products to an art dealer known for his discounting practices, and Hibel required that Winn rescind the transaction. Winn's relationship with Hibel soured to a breaking point following a sale Winn made at a Rotary Club art show in 1981. Winn sold some Hibel lithographs at a discount to a party secretly acting on Elegante's behalf. Elegante had the transaction tape recorded and reported it to Hibel, which then reimbursed Elegante for the lithographs. In response, Hibel wrote Winn expressing displeasure about the manner in which Winn had displayed its artwork at the show, although it did not mention the discounting.

---

* Honorable Robert H. Hall, U.S. District Judge for the Northern District of Georgia, sitting by designation.

1. The district court also directed a verdict on the dealer's claim against the manufacturer for breach of contract. The court's ruling was imminently correct, as the claim was frivolous.

In early 1982, Hibel ceased filling Winn's orders for artwork except for continuation plates.[2] By 1985, Hibel ceased filling Winn's orders altogether.

On April 5, 1985 Winn brought this suit against Hibel. Winn's complaint alleged that Hibel violated section 1 of the Sherman Act by terminating Winn's dealership in combination with Elegante to protect Elegante from price competition and to maintain Hibel's retail price schedule on its products. Hibel, in its answer, admitted that it urged its dealers to adhere to its suggested retail prices, but denied that it terminated Winn pursuant to a conspiracy with Elegante. Hibel also denied that Winn had suffered any damages as a result of the termination of Winn's dealership.

At trial, after Winn presented his case, Hibel moved for a directed verdict. The court granted its motion, concluding that Winn's proof did not exclude the possibility that Hibel acted independently rather than in furtherance of a price-fixing conspiracy in terminating Winn's dealership. Alternatively, the court concluded that Winn had not sustained any damages because his business had never made a profit. Winn appeals. We affirm because Winn failed to establish that Hibel and Elegante acted in concert to fix prices.

## II.

Under section 1 of the Sherman Act, concerted action by a manufacturer and its retailers to set or maintain retail prices is *per se* illegal, *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); it is not illegal, though, for a manufacturer independently to announce a price and terminate retailers who do not adhere to it. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). The validity of concerted action by a manufacturer and retailer regarding non-price restrictions, however, is determined under a rule of reason analysis. *Business Elec. Co. v. Sharp Electronics Co.*, —— U.S. ——, ——, 108 S.Ct. 1515, 1523, 99 L.Ed.2d 808 (1988). *See also Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

Since this is an appeal from a directed verdict, the evidence must be viewed in a light most favorable to the non-moving party. *Huff v. Standard Life Ins. Co.*, 683 F.2d 1363, 1366 (11th Cir.1982). We may affirm only if " 'the facts and inferences point so strongly and overwhelmingly in favor of the non-moving party that reasonable persons could not arrive at a contrary verdict.' " *Id.* (quoting *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1371 (5th Cir. 1982) (en banc)).

The Supreme Court has modified this standard in cases of vertical price fixing. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). *See also Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1534 (11th Cir.1987) (11th Circuit explicitly adopting a two-part test derived from *Monsanto* and *Matsushita* for use in summary judgment cases). First, the plaintiff must show that the conspiracy alleged is an economically reasonable one. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Then, the plaintiff must present evidence which "tends to exclude the possibility that the manufacturer and nonterminated distributor[ ] [were] acting independently," *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471, such as "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and [the] other[ ] [distributor] 'had a conscious

---

**2.** Continuation plates were part of a method Hibel had of marketing its limited edition collector plates through matched number sets. Hibel would create a series of plates with a common theme, each being produced at a different time, and each individual plate would have a number corresponding to its place within the series. That is, the thirty-second individual plate out of a total of ten thousand plates would have the number 32/10,000. If a Hibel dealer purchased plate number 32/10,000 of the first plate of the series, Hibel would guarantee that the dealer could purchase plate 32/10,000 of the rest of the plates of that series when those plates were distributed; these were referred to as continuation plates.

commitment to a common scheme designed to achieve an unlawful objective.'" *Id.*, 465 U.S. at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). Merely terminating a dealer who discounts in response to complaints from another dealer about his discounting does not show such a common scheme since such termination is equally likely to be done independently by a manufacturer. *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470.

In light of this two-step test for determining whether a terminated dealer has presented sufficient evidence to reach a jury, we conclude that the district court correctly directed a verdict against Winn. Although Winn's proof established an economically reasonable conspiracy, it failed to establish a common price-fixing scheme between Hibel and Elegante.

The conspiracy was a reasonable one because by fixing prices on Hibel products, Hibel and its dealers would be able to attain monopoly profits.[3] Artwork such as that created by Hibel is a unique product whose market is based on individual taste and perceived investment value rather than competitive market conditions. Thus, retail price maintenance is not easily subject to outside competition, and could in fact enhance the product's investment value.

Turning to the second step of this test, though, we conclude that Winn's proof did not exclude the possibility that Hibel acted independently of Elegante's complaints. Although the evidence did tend to show that Hibel acted to terminate Winn after receiving complaints from Elegante, this by itself was not sufficient to establish a case for the jury; a manufacturer may legitimately respond to pressure from a dealer in order to avoid losing that particular dealer's business.[4]

Hibel had sufficient reason to maintain a retail price structure to have acted independently. Much of the value of the Hibel products stemmed from their presumed investment value. Discounting by Winn served to cheapen their image in the eyes of the investing public and therefore undermined their attractiveness to potential customers as well as their value to those already owning them. Winn failed to present evidence refuting these reasons for Hibel's termination of his dealership. Conduct that is as "consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy," *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1357; accordingly, Winn's argument that he made out a case for the jury must fail.

Unlike *Monsanto*, where the sole purpose of the manufacturer's complaints to the distributor was to force the distributor to maintain the manufacturer's retail pricing structure, the manufacturer's purpose here was to maintain its image and the integrity of its products, and to keep Elegante as a dealer.[5] Hibel's complaints to Winn concerning his discounting practices dealt with the harm such discounting did to the Hibel image. Winn's most persuasive piece of evidence, a letter from Elegante to Hibel stating that it had not discounted and expressing the hope that Hibel would prevent Winn from discounting, did not rebut this purpose. This letter was unsolicited by Hibel and merely showed Elegante's own concern with Winn's discounting. Also, unlike the evidence in *Helicopter Support Systems*, 818 F.2d at 1535—which included a distributorship agreement explicitly stating that the manufacturer's suggested retail price list was binding, correspondence indicating the manufacturer had taken action against the price cutting dealer due to a competing dealer's complaint, and the manufacturer's request that

---

3. Monopoly profits means more than a reasonable profit than can be made in the face of competition.

4. Winn's ultimate termination came years after Elegante's complaints began, further weakening the link between the two actions.

5. The record suggests, as the district court observed, that the Monticello, New York area could not sustain two Hibel dealers. Given this circumstance, Hibel certainly had a right to terminate one of them.

future violations be reported—Hibel never reassured Elegante that it had taken action on its complaints, nor requested that Elegante report further pricing violations.[6]

We believe that our disposition of Winn's antitrust claim is mandated by current case law. Other circuits dealing with claims of vertical price fixing since *Matsushita* and *Monsanto* have found evidence of price fixing comparable 'or greater than that which Winn presented insufficient to make out a *per se* case of price fixing. *See Culberson, Inc. v. Interstate Elec. Co.*, 821 F.2d 1092 (5th Cir.1987) (summary judgment); *Garment Dist. Inc. v. Belk Stores Serv. Inc.*, 799 F.2d 905 (4th Cir.1986), *cert denied,* — U.S. —, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988) (directed verdict); *McCabe's Furniture, Inc. v. La–Z–Boy Chair Co.*, 798 F.2d 323 (8th Cir.1986), *cert denied,* — U.S. —, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988) (judgment notwithstanding the verdict).

AFFIRMED.

---

6. Even if the evidence would have permitted the jury to find that Hibel and Elegante conspired to terminate Winn because his conduct harmed the Hibel image, this would be a non-price restraint judged under a rule of reason analysis, a claim not raised by Winn. *See Business Electronics,* — U.S. at —, 108 S.Ct. at 1521–22.