In the Matter of Ike SLODOV, Debtor.

Arrangement No. B70–4787A.

United States Bankruptcy Court,
N.D. Ohio.

Feb. 28, 1983.

Gerald Musserman, Cleveland, Ohio, for applicant.

Donald McFadden, Cleveland, Ohio, for debtor.

Paul Weick, Cuyahoga Falls, Ohio, for Ronald Rubenstein.

Ronald Rubenstein, Cleveland, Ohio, for trustee, National City East.

Lewis A. Zipkin, Cleveland, Ohio, trustee.

## FINDING AS TO THE ALLOWANCE OF FEES AND EXPENSES—LEWIS A. ZIPKIN

H.F. WHITE, Bankruptcy Judge.

On November 19, 1980, Mark Schlachet, United States Bankruptcy Judge for the Northern District of Ohio, appointed Lewis A. Zipkin Trustee of the estate of Ike Slodov, debtor, based upon an application filed by Joseph P. and Ruth Earley, creditors in this proceeding. Said application was filed on November 5, 1980. The Court established the bond of Mr. Lewis A. Zipkin in the amount of $5,000. The order provided that Mr. Zipkin, as Trustee, would have all the powers enumerated in Sections 441–442 inclusive of the Bankruptcy Act of 1898 as amended and that he should be compensated in accordance with Bankruptcy Rule 12–28 pursuant to Section 491 of the Bankruptcy Act of 1898 as amended.

On December 9, 1980, another order was issued by Bankruptcy Judge Mark Schlachet appointing Lewis Zipkin Trustee of the estate of Ike Slodov, a Chapter XII proceeding, and fixing the bond at $5,000. On or about December 11, 1980, Mr. Lewis A. Zipkin did procure a bond as required by the Court, said bond being issued by Lombardo-Santoli Insurance Agency, Inc. The charge for the bond was $200.00.

On February 4, 1981, an order was entered authorizing Lewis A. Zipkin, as operating Trustee, to operate the business of Ike Slodov, being rental properties with the exception of the dental practice. Although the order required Ike Slodov, debtor, to turn over to the Trustee all assets and funds, Lewis Zipkin, the Trustee, never requested Ike Slodov to turn over funds from the dental practice.

Subsequently, based upon a motion filed by the First Federal Savings and Loan Association of Willoughby for a sequestration of rents, on April 27, 1981 an order was entered authorizing the Trustee to operate and manage Early Village Apartments but limited the expenditures of funds from rents obtained in the operation of the Early Village Apartments.

On December 17, 1980, Lewis A. Zipkin, as trustee, did file a motion for the appointment of Sindell, Sindell, Selker, Rubenstein, Einbund and Pavlik Co., L.P.A. as his attorneys. A form application was used and on December 17, 1980 the Court by order did approve said application, but did not specify the particular purposes for which these attorneys were being retained by the Trustee, except the order did provide that they were qualified to act as attorneys for the purposes set forth in the motion.

Mr. Zipkin did act as Trustee in this estate until his resignation in September 1982. An Affidavit of Prejudice was filed by the debtor against Mr. Zipkin and said matter was to be heard by this Court; however, Mr. Zipkin voluntarily resigned prior to that hearing.

On September 10, 1982 Mr. Lewis A. Zipkin filed a third and final application for the allowance of fees and expenses as operating Trustee in this case. He asks for a total fee to be paid in the amount of $88,-338.07. This amount is based upon the final application for allowance of fees and expenses in the amount of $40,112.50 as filed on September 10, 1982. A second application for allowance of fees was filed on February 12, 1982 in the amount of $58,225 with reimbursement of expenses in the amount of $176.57. A hearing on this fee application was held by former Bankruptcy Judge Mark Schlachet. No written order had been made on this fee application based upon the objections made; however, the docket does indicate that from the bench Bankruptcy Judge Mark Schlachet allowed $10,000 in interim fees with $176.00 in expenses.

The debtor, Ike Slodov, filed an objection to the allowance of said fee application and expenses as being excessive stating that the Trustee was negligent in the administration of the estate. Further, because of his close association with the former Bankruptcy Judge and his continual association with the former Bankruptcy Judge during the administration of this case, the debtor claims that the appointment should never have been made and that the entire fee application should be disallowed and the Trustee should be required to reimburse the estate for fees received which were authorized by former Bankruptcy Judge Mark Schlachet.

### FINDING OF FACT

1. On December 9, 1980, Lewis A. Zipkin was appointed Trustee of the estate of Ike Slodov, a Chapter XII proceeding. His bond was fixed at $5,000, which was inadequate considering the size of the estate.

2. On February 4, 1981, an order was entered authorizing Lewis Zipkin as an operating Trustee to operate the real estate and rental property of the debtor consisting primarily of Early Village and Shoreway Circle.

3. On December 17, 1980 Lewis A. Zipkin obtained the appointment of Sindell, Sindell, Selker, Rubenstein, Einbund and Pavlik Co., L.P.A. as his attorneys. This

application was approved by a Court Order on the same date. There were never any orders retaining Mr. Zipkin as an attorney in these proceedings nor were any orders entered retaining any members of Lewis A. Zipkin's law firm as attorneys in these proceedings.

4. Mr. Zipkin is an attorney at law, licensed to practice in the State of Ohio since October of 1964. Further he has been engaged in the business of real estate development since 1965.

5. His primary experience in real estate development has been the restoration or redevelopment of real property, primarily two-family homes in the Shaker Heights Cleveland area, being property that he purchased and renovated and upgraded.

6. Mr. Zipkin also served as Trustee in bankruptcies that were administered by Bankruptcy Judges Mark Schlachet, William O'Neill, and John Ray. Lewis Zipkin testified that his hourly rate as an attorney was $100 per hour. Therefore, he claimed that he was promised to be reimbursed for the time expended upon his appointment as Trustee in this estate the sum of $100 per hour and that said rate was promised to him prior to his appointment. There was no evidence of who made this promise. The Court finds that the debtor, Ike Slodov and his attorneys, never agreed to this arrangement.

7. Lewis A. Zipkin did request in his first fee application to be permitted to pay Alan M. Goodman for 32½ hours of legal services rendered in eviction proceedings involving this estate. Attorney Alan M. Goodman was never retained to furnish legal services to this estate by the Trustee. Aaron J. Ritzenberg was used as an attorney in these proceedings for eviction purposes and billed the estate for two hours and thirty minutes. There was no court order retaining Mr. Ritzenberg as an attorney in these proceedings. The rate at which these attorneys billed the estate was $100 per hour in the first application filed on February 12, 1982.

8. Barbara Milazotta, Francine Starke, and Phyllis A. Watkins were used by the Trustee as paralegal staff members. It was indicated that they had 304 hours of billed time at the rate of $25 per hour and that their services were billed to the estate in the aggregate amount of $7,600. There was no court order retaining these persons by Trustee Lewis A. Zipkin. In the second fee application which is under consideration by this Court in the amount of $58,225, Mr. Alan Goodman shows billable time of 33½ hours at $75 per hour for services rendered principally in eviction matters, making a total claim of $2,512.50. There is also a claim for Phyllis A. Watkins in the amount of billable time of 1,179.5 hours at $25 per hour, totaling $29,487.50. Said time was billed as a paralegal assistant. Therefore, between the period of February 1981 to December 1981 Mr. Zipkin billed time for Phyllis A. Watkins in the amount of $34,562.50. Subsequently, a motion was filed and an order was entered as of February 12, 1982 hiring Phyllis Watkins as of January 1, 1982 as an employee of the estate at $2,000 per month. Therefore, the estate was being billed a total of $50,562.50 for services performed by Phyllis A. Watkins.

9. The Court finds from the testimony that during the period of February 24, 1981 up to December 28, 1981 Phyllis Watkins was not an employee of Lewis A. Zipkin but was an employee of Phyllis Watkins, Inc. and that the payments referred to in paragraph 8 were to be paid to Phyllis Watkins, Inc. Phyllis Watkins, Inc. is an Ohio corporation owned by Phyllis Watkins.

10. The amount paid Phyllis Watkins by Lewis A. Zipkin varies from the testimony given by him on November 16, 1981 before Bankruptcy Judge Schlachet, being Debtor's Exhibit BB, page 85. Phyllis Watkins' salary varied between $1,300 and $1,500 per month. However, the records indicate that she was paid substantially higher amounts as set forth in Finding No. 8. Phyllis Watkins during the years 1981 and 1982 also conducted an electrolysis and skin care business located on Fairmount Boulevard in the Cleveland area. Subsequently that business was sold on April 14, 1982. Further, during this period of time, she was enrolled as a

full-time student carrying 12 to 14 hours for the Fall 1981 school year at Case Western Reserve University, Debtor's Exhibit Z. She dropped one course, Principles of Economics, and completed nine hours. She then enrolled for the Spring semester 1982 with four courses, but later withdrew. In the Fall semester of 1981 she was attending school on Mondays from 11:15 AM to 12:30 PM and from 4:00 PM to 7:00 PM. Wednesdays she was attending classes from 11:15 AM to 12:30 PM and on Tuesdays and Thursdays she was attending classes from 1:15 PM to 4:00 PM. For the Spring semester of 1982 she was attending classes on Mondays, Wednesdays, and Fridays from 11:15 AM to 12:05 PM and Tuesdays and Thursdays from 1:15 PM to 2:30 PM. Miss Watkins had no previous construction experience.

11. The maintenance staff and the office personnel at Early Village were prior employees of the debtor and were working in Early Village in December of 1980 when Lewis A. Zipkin was employed as Trustee and they continued to function, with the exception of the office girl who was subsequently discharged and replaced by the wife of one of the maintenance persons.

12. During Mr. Zipkin's term as Trustee, he made no payments to the secured creditor and used income and Certificates of Deposit for the payment of the rehabilitation of the said property and for payment of operating expenses. A Certificate of Indebtedness was authorized based upon a hearing held on November 16, 1981. One of the principal purposes that this Certificate of Indebtedness was necessary was to install a new boiler in building C, Debtor's Exhibit M, dated October 1, 1981. The first draw on this Certificate of Indebtedness was made in the amount of $25,000, less $4,449.55 paid to Arter and Hadden for legal services to First Federal Savings and Loan Association of Willoughby for making the loan. The amount actually deposited was $20,550.45 in Bank One of Ravenna, Ohio. This loan was made despite an appeal of the order authorizing the issuance of the Certificate of Indebtedness.

13. The boiler repair or installation was not made during the Winter season of 1981–1982 and as of September 1982 the boiler was not certified for operation. The Trustee did not take the necessary steps to winterize the building during 1981–1982 so that extensive damages occurred due to the freezing of various pipes throughout the building; also the building couldn't be rented.

14. The firm of Sindell, Sindell, Selker, Rubenstein, Einbund and Pavlik Co., L.P.A. did incur, as set forth in their application of September 2, 1982, $22,968.75 in legal services and expenses of $473.50 as attorneys for the Trustee. In their Exhibit A attached to their application, they indicated that services were rendered beginning on January 12, 1981 up to and including August 27, 1982, the billing rate being between $90 per hour to $150 per hour depending upon the attorney who rendered the services in said firm.

15. Further in the year 1981 the total accountable income to the estate was $282,288.68. Administrative charges requested by the Trustee for all services rendered, including the paralegal assistants and the attorneys in his office, amounted to $111,060.54 which would be approximately 39.3 percent of the total funds received. For the year January 1982 to August 1982, the total income in the estate amounted to $219,455.68, which would amount to 51 percent for total administrative expenses. Mr. Zipkin in his testimony indicated that this was excessive for management of real estate and that in his opinion 25 percent would be reasonable. The Court determines that real estate management companies charge between five to ten percent for management of property.

16. In the second application for fees totaling $58,225 Mr. Zipkin scheduled 100 unrecorded hours for the months of April through August 1981. At a charge of $100 per hour, this would amount to $10,000. As to the itemized time in the application for fees, the trustee indicates that he was charging $100 per hour for routine services, such as signing checks on April 28, 1981;

May 6, 1981; May 11, 1981; May 19, 1981, etc.

17. Former Bankruptcy Judge Mark Schlachet was appointed a Bankruptcy Judge on or about October 21, 1977. During the period 1973 to 1975 Mark Schlachet and Lewis A. Zipkin occupied the same law office and did associate as lawyers in litigation in the Cleveland area, page 31, "Excerpts of Proceedings", dated November 19, 1982.

18. Lewis A. Zipkin at the time of his appointment as Trustee of this estate did not disclose his legal relationship with Bankruptcy Judge Mark Schlachet or members of his family to Dr. Slodov or to his attorney Donald McFadden. Nor did Lewis A. Zipkin at any time subsequent to his appointment or at any hearing make a disclosure of his legal or business relationships with former Bankruptcy Judge Schlachet or members of his family until it became public knowledge sometime in March of 1982.

19. Lewis A. Zipkin filed a lawsuit on June 20, 1977 on behalf of Barbara Schlachet and Mark Schlachet against Dr. Wendall W. Adams and St. Luke's Hospital in the Court of Common Pleas of Cuyahoga County, being a complaint for malpractice, Debtor's Exhibit KK. Said complaint was dismissed by Stipulation and Judgment Entry by Lewis A. Zipkin on December 18, 1979.

20. On September 14, 1978 a suit was filed in the Court of Common Pleas of Cuyahoga County by Barbara Schlachet, Plaintiff, versus Volvo of America Corp., being a complaint regarding the purchase of a motor vehicle. Attached to said complaint were three work orders executed at jaguar-cleveland. Two of said work orders were signed by Mark Schlachet, debtor's Exhibit LL. On May 20, 1981 Lewis A. Zipkin wrote a letter to the Hon. John L. Angelotta, Judge of the Court of Common Pleas of Cuyahoga County, in which he requested an indefinite suspension of the proceeding in said case, debtor's Exhibit MM.

21. Lewis Zipkin also represented jaguar-cleveland. A motor vehicle was purchased from said dealership by the Schlachets and a discount was given to the Schlachets in the amount of $6,000, being the same amount which was involved in the Volvo lawsuit that Zipkin requested to be indefinitely suspended, pages 26 and 27 "Excerpts of Proceedings", November 19, 1982.

22. The Court further finds that in the Spring or Summer of 1981, Lewis Zipkin, the sole owner of Rita Corporation, did enter into a sale of real estate made to E. Brown Properties, which was Edith Brown, mother of Judge Schlachet's wife. Subsequently a law suit was filed on behalf of E. Brown Properties and Rita Corporation for alleged damages to a boiler which were undisclosed at the sale, pages 19, 20, and 22 of the "Excerpts of Proceedings", November 1982 by Lewis A. Zipkin.

## DISCUSSION OF LAW

Debtor, Ike Slodov, has filed his objection to the former trustee's, Lewis A. Zipkin (hereinafter referred to as "Zipkin"), final application for allowance of fees and expenses as operating trustee. Further, on September 14, 1982, debtor filed a Motion to Vacate Order dated July 16, 1981 and March 4, 1982 wherein allowances of fees and expenses were made to the Operating Trustee. Said motion also requested an order requiring Zipkin to return to the debtor monies paid to him pursuant to the orders. As grounds for the objection and motion to vacate, debtor has alleged a violation of Bankruptcy Rule 505(a)(2) and has further argued that the services rendered by Zipkin to the estate were negligently performed.

In determining the issues presented herein, the Court will initially discuss the argument raised by debtor regarding the adequacy of the services rendered by Zipkin. Thereafter, it will discuss the issues regarding Bankruptcy Rule 505(a)(2) and whether compensation for services rendered by Zipkin may be awarded.

### I.

Once appointed, a trustee has the duty to protect and conserve the assets of

the estate for the benefit of the creditors. *United States ex rel. Willoughby v. Howard,* 302 U.S. 445, 58 S.Ct. 309, 82 L.Ed.2d 352 (1938); *Ford Motor Credit Co. v. Weaver,* 680 F.2d 451 (6th Cir.1982); *Matter of Halux, Inc.,* 665 F.2d 213 (8th Cir.1981). A trustee may be held liable for negligence in the performance of his duties as trustee. *Ford Motor Credit Co. v. Weaver, supra; Carson, Pirie, Scott & Co. v. Turner,* 61 F.2d 693 (6th Cir.1932). Testimony at the hearing on Zipkin's application for fees and reimbursement of expenses showed that in many respects, Zipkin was negligent in his management of the Slodov estate and that further rather than attempting to minimize expenses to the estate through his trusteeship he substantially increased expenses and thereby failed to conserve the estate's assets.

At the hearing, Zipkin testified that Building C of the Early Village Complex has roof problems and, in particular, the roof had drainage problems. Zipkin first noticed these problems "shortly after he became trustee" in January 1981. Despite the trustee's knowledge, the roof drainage problem was not corrected until Spring 1982. Zipkin admitted at the hearing that the drainage problem caused the roof to continually leak water whenever it rained to the extent that the apartments below the roof were damaged. Building C was required to be closed during the Winter of 1981–1982. The Trustee indicated at the hearing that the reason the roof was not repaired earlier than Spring 1982 was due to the lack of monies to pay for the repairs. However, during his trusteeship, Zipkin did not make current interest payments on the mortgage loan as required by a court order to First Federal Savings and Loan nor did he pay real estate taxes as they fell due during the period of the trusteeship. These expenses had been paid by the debtor, Ike Slodov, during the time that he was in possession of the estate. Thus, it would appear that the monies which otherwise would have been used to make the mortgage and tax payments could have been used to repair the roof.

Additionally, Zipkin testified that despite needing immediate repairs, the boiler in Building C was not replaced until after the winter months of 1981–1982. Because of this, there was no heat in that building and the pipes froze. Zipkin failed to have the boiler promptly replaced despite the fact that he had been authorized to execute a Certificate of Indebtedness for the specific reason of obtaining monies to have the boiler work done.

In addition to the negligent manner in which this estate was handled by Zipkin, Zipkin also incurred excessive expenses on behalf of the estate, primarily for the payment of compensation to himself and members of his law office staff. Initially, Zipkin utilized the services of an alleged employee of his law firm, Phyllis A. Watkins, as a paralegal on this case. Ms. Watkins performed many of the day-to-day management duties for Early Village. Zipkin has requested payment for her services on the basis that 100 percent of her employment time was spent working for Early Village. As shown at the hearing, however, Ms. Watkins was physically incapable of working a full-time job for Early Village. In addition to the services that she performed for the estate, Ms. Watkins also ran her own corporation known as Phyllis Watkins, Inc. and was a full-time student at Case Western Reserve University.

Examination of the documentation submitted in support of the compensation sought by Zipkin also shows that Zipkin spent an excessive amount of time in conferences with Ms. Watkins regarding the operation of Early Village. Indeed, a rough tally done by this Court shows that no less than 41 percent of the time for which Zipkin seeks compensation on his final application and perhaps as much as 51 percent of that time was spent conferring with Ms. Watkins. The Court finds that by utilizing the services of Phyllis Watkins on this case, Zipkin did no more than place an extra unnecessary layer of management into the operation of the Early Village Complex.

Examination of the various documents regarding fees and expenses filed in this

case also shows that Zipkin paid attorney's fees to Alan Goodman without authorization. Goodman, who is a member of Zipkin's firm, did eviction work for the estate. Zipkin also paid himself the sum of $10,000 as Trustee's fee without said amount being authorized by a docketed court order. In regard to the latter payment, however, this Court does take note of the fact that the payment of this amount was orally authorized by former Bankruptcy Judge Mark Schlachet, but was never reduced to a written court order.

■ Finally, it has been shown that Zipkin made an agreement as to the amount of fees to be paid him as trustee in this case, that amount being the sum of $100 per hour. Such an agreement is not authorized by the Bankruptcy Act of 1898, nor is it authorized by any Bankruptcy Rule. It has also been shown that Zipkin told debtor, Ike Slodov, in July 1982 that he would resign as trustee in this case providing that Slodov agreed to pay him the sum of $75,000 in trustee's fee. The determination as to the amount that should be paid a trustee for his services in a case is a judicial determination. As such, Zipkin could not and should not have proposed to the debtor the fee arrangement in question.

■ It is the duty of the trustee to conserve and preserve the estate for the benefit of the creditors. *Matter of Halux, Inc., supra.* Zipkin in his role as Operating Trustee of the Slodov estate, failed to meet this duty. He was negligent in his operation of the estate, insofar as he failed to have necessary repairs made to Early Village in a timely manner. Also, he was highly inefficient in the operation and management of the estate, both himself and through his employee, Phyllis Watkins.

## II.

The second issue presented this Court involves Bankruptcy Rule 505(a). That Rule provides, in part, that:

No person may be appointed as trustee, receiver, marshal, or appraiser or employed as accountant or auctioneer in a bankruptcy case ... 2) if he is so connected with any judge or referee of the court making the appointment or authorizing the employment as to render such appointment or employment improper.

Debtor argues that Zipkin's appointment was improper pursuant to this Rule by virtue of the relationship between Zipkin and the former Bankruptcy Judge who appointed Zipkin, Mark Schlachet. Evidence in the form of oral testimony and written documents was provided in support of this contention.

The evidence upon which Slodov primarily relies for his argument that there was an improper connection between former Bankruptcy Judge Schlachet (hereinafter referred to as "Schlachet") and Zipkin was evidence showing that at the time Zipkin was appointed as Operating Trustee in this case and continuing during the period of the trusteeship, Zipkin was the personal attorney for Schlachet and his wife, Barbara Schlachet. In particular, it was shown that a complaint was filed by Zipkin on behalf of Mrs. Schlachet against Volvo of America Corp. on September 14, 1978 (Debtor's Exhibit LL). The complaint alleged defects in a Volvo automobile purchased by Plaintiff from one of defendant's distributors. That the trustee's representation of Mrs. Schlachet continued during the period in which Zipkin acted as trustee of debtor's estate is evidenced by a letter from Zipkin to Judge John Angelotta of the Cuyahoga County Common Pleas Court regarding the Volvo action dated May 20, 1981 (Debtor's Exhibit MM).

Said letter requested an indefinite suspension of proceedings in Mrs. Schlachet's case in light of the fact that Volvo Co. was then involved in negotiations on certain matters in the White Motor reorganization case which was then pending before Schlachet. (The case with Volvo Co. ultimately resulted in Mrs. Schlachet obtaining an automobile from jaguar-cleveland, one of Zipkin's clients, at discount.[1])

---

1. The case with Volvo brought by Barbara Schlachet resulted in a jury verdict in favor of

Volvo. Other claims involving repairs made to

It was further shown that the Trustee had filed a malpractice action on behalf of Mark Schlachet and Barbara Schlachet against Dr. Wendall Adams and St. Luke's Hospital on June 20, 1977 or approximately four months prior to Schlachet's appointment as Bankruptcy Judge. Although Zipkin testified at the trial that the complaint was filed as a favor to toll the Statute of Limitations, the journal entry dismissing the case dated December 18, 1979 was submitted with Zipkin's name thereon as Attorney for Plaintiff.[2]

Testimony was also elicited to the effect that shortly prior to Schlachet's judicial appointment, Zipkin aided Mrs. Schlachet in the purchase of the Volvo for which the above-referenced lawsuit was filed. Zipkin negotiated the purchase agreement and also executed the agreement on Mrs. Schlachet's behalf.

Over and above the fact of the attorney-client relationship in effect between Mrs. Schlachet and Zipkin at the time of the appointment, it was also shown that beginning in 1973 and ending sometime between 1975 and 1976,[3] Schlachet was associated with Zipkin's firm as an attorney. Testimony at the hearing showed that Zipkin and Schlachet had handled a class action dealing with refrigerant gasses during this period and they shared the fee on that case, which fee was not paid Schlachet until after he was appointed a Bankruptcy Judge.

Additionally, it was shown that Rita Corp., a corporation owned by Zipkin, sold real property to Schlachet's mother-in-law, Mrs. Brown, dba E. Brown Properties. Subsequent to this, Rita Corp. and E. Brown Properties were plaintiffs in a lawsuit brought against prior sellers of the property.

The issue then is whether or not the referenced connections are sufficient to render the appointment of Zipkin as operating trustee improper. This Court believes, based on these facts, that the appointment was improper.

The prohibition against appointment where there are improper connections between an appointee and a judge is derived from the "improper connection" clause contained in 28 U.S.C. Section 455. Advisory Committee's Note to Bankruptcy Rule 505. Thus, cases decided pursuant to that section are relevant herein.

In *Smith v. Sikorsky Aircraft*, 420 F.Supp. 661 (C.D.Ca.1976), the District Court Judge recused himself under 28 U.S.C. Section 455(a) and Canon 3 C of the "Code of Judicial Conduct". Basis for the recusal was that an attorney who had formerly represented the judge in two mandamus actions brought against the judge in his official capacity had become associated with the law firm representing the plaintiff in *Smith*.

The trial court judge's failure to recuse himself caused the Fifth Circuit Court of Appeals to remand the case for new trial in *Potashnick v. Port City Construction Co.*, 609 F.2d 1101 (5th Cir.1980). The judge in that case was a former partner in the law firm representing the plaintiff in *Potashnick*. The judge's father at the time of the trial was a senior partner in the same firm. Lead counsel for the plaintiff was an individual with whom the judge was associated in several business investments. These investments resulted in at least one lawsuit in which the judge and plaintiff's chief counsel were parties. Additionally, the counsel in question had represented the judge to a very minor extent in a law suit in which both he and the judge were involved. In remanding the case, the Court of Appeals took care to note that no bias or prejudice in favor of the plaintiffs had been alleged. Instead, the court queries as to how it

---

the same Volvo resulted in an automobile being purchased by Mrs. Schlachet from jaguar-cleveland.

**2.** Zipkin also testified that he "may have" handled the settlement in this matter and that he authorized his signature being placed on the

dismissal entry. Transcript, November 19, 1982, page 29.

**3.** Zipkin was unable to recall the years during which Schlachet was associated with Zipkin's firm. Transcript, November 19, 1982, page 39.

would look to the "average man on the street" for a judge to have the sort of relationship with a party's chief counsel as it had in *Potashnick.* Believing that the same wouldn't look proper, the case was reversed.

In the instant case, Zipkin not only represented the Schlachets prior to his appointment as Trustee but he continued to represent Mrs. Schlachet during the period of time that he was trustee of the Slodov estate. Zipkin admits that he was "actively involved" in the representation of Mrs. Schlachet in her complaint against Volvo of America. That it is the former Bankruptcy Judge's wife who was Zipkin's client during the trusteeship rather than Schlachet himself does not matter. Interim Advisory Committee on Judicial Activities Advisory Opinion No. 20. This Court, therefore, must conclude that the appointment was improper and such an appointment would foster an opinion by the general public of a lack of confidence in an impartial and fair judiciary.

### III.

■ Having found that 1) Zipkin was negligent in the performance of certain of his duties while trustee and 2) the appointment of Zipkin by Schlachet was improper, this Court next determines whether an award of fees for Zipkin's services as trustee may be granted. In this regard, debtor, Ike Slodov, not only contends that an award of fees is inappropriate, he also seeks to have earlier orders awarding fees to Zipkin vacated and the monies paid to Zipkin pursuant to these orders returned to the estate. In determining whether Zipkin is entitled to fees despite his improper appointment and his negligent handling of the estate, it should be remembered that in seeking compensation for services rendered, Zipkin is held to fiduciary standards. *Brown v. Gerdes,* 321 U.S. 178, 64 S.Ct. 487, 88 L.Ed. 659 (1944).

The federal courts have relied upon a multitude of reasons to deny attorneys, receivers, and trustees compensation for services performed in a bankruptcy or reorganization case. Thus, an attorney's failure to disclose at the time that the order appointing him as counsel was entered the fact that he had represented the debtor on a previous occasion resulted in a denial of all compensation to the firm in question. *In the Matter of Arlan's Department Stores, Inc.,* 615 F.2d 925, 5 B.C.D. 973 (2d Cir. 1979). Malfeasance by a trustee in the performance of his duties by virtue of his failure to properly supervise a bookkeeper-employee's activities so that the bookkeeper was able to engage in a continuous course of criminality resulted in a denial of trustee's fees. *In re Johnson,* 518 F.2d 246 (10th Cir.1975). The discovery of improper fee-sharing arrangements and convictions for embezzlement from the bankrupt estate have resulted in denial of compensation. *In the Matter of Futuronics Corp.,* 655 F.2d 463, 7 B.C.D. 1427 (2d Cir.1981); *In re Endeco, Inc.,* 675 F.2d 166 (8th Cir.1982).

In a case where a referee allowed extravagant, if not wrongful, use of trust funds by the trustee while also failing to require the trustee to satisfy his reporting duties, compensation to the referee for his services was denied. *In re Stillwell,* 12 F.2d 205 (6th Cir.1926).

■ Statutory authority for the disallowance of fees is found in Section 48e of the Bankruptcy Act of 1898, 11 U.S.C. Section 76. That section provides that:

> The court may, in its discretion, withhold all compensation from any receiver, trustee, attorney, or any other person who has been removed from office or dismissed because of the unlawful sharing of fees or for *any other cause.* (Emphasis mine)

This section may be applied in the instant case notwithstanding the fact that Zipkin was not removed from the case, but instead resigned. *In re Endeco, Inc., supra.* As set forth in 2A Collier on Bankruptcy, Section 48.11, page 1816.4 (14th ed. 1978), "And where a trustee is permitted to resign to avoid the odium of removal, his compensation may be either reduced or denied entirely, depending upon the circumstances." Had Zipkin not resigned, it may well be

that he would have been removed from office.

This Court finds that looking at this trusteeship in its totality, Zipkin should be denied fees under the "any other cause" language of Section 48e. Initially, Zipkin, with full knowledge of the circumstances and without regard to his ethical duty as an attorney and officer of the court "to avoid the appearance of impropriety", accepted this improper appointment. When the trusteeship was offered, Zipkin had a choice—he could accept the appointment and resign as Schlachet's family attorney or he could refuse the appointment. Zipkin chose to do neither.

Having accepted the improper appointment, Zipkin was bound to exercise diligence in his administration of the estate so as to conserve the assets of the estate. *Carson, Pirie, Scott & Co. v. Turner, supra.* Indeed, Zipkin could have minimized, to an extent, the effect of his improper appointment through a diligent and effective operation of the estate. Instead, as was shown at the hearing, there has been a serious decrease in income to the estate from the real estate holdings during Zipkin's trusteeship. It was also shown that Zipkin's substantial delay in replacing the boiler in Building C of the Early Village Complex resulted in that building being uninhabitable during the Winter months of 1981. Additionally, Zipkin has requested payment of fees and expenses in this estate in an amount totalling 45 percent of the income generated through the holdings. This excessive request has been made despite Zipkin's statement at the hearings that he felt a 25 percent management fee was reasonable.

The Court finds that there has been some benefit to the estate through the trusteeship. Despite this benefit, the Court concludes that fees must be withheld herein. To do otherwise would encourage future appointments such as that of Zipkin's and would serve to heighten public disrespect for the judicial branch and lawyers in general. In withholding fees, this Court makes special note of the fact that the problem herein could have been lessened also through a careful, cost-efficient, and diligent management of the real estate holdings, something which did not occur in this case.